In the Supreme Court of Georgia

Decided: June 1, 2015

S15A0260. CHATMAN v. WALKER.

HINES, Presiding Justice.

In 2005, a jury convicted Gregory Walker of malice murder and related crimes, and the jury fixed Walker's sentence for the murder at death. This Court unanimously affirmed Walker's convictions and sentences. See *Walker v. State*, 281 Ga. 157 (635 SE2d 740) (2006). In September 2008, Walker filed a petition for a writ of habeas corpus. In August 2014, following two hearings, the habeas court granted Walker's petition in part and denied it in part, letting his convictions stand but vacating his death sentence. The Warden now appeals. We affirm.

*I. Factual Background*

On the morning of June 8, 2001, Walker, along with Shedrick Tate and Denise Green, were asleep in a room at the Howard Johnson motel in Brunswick, Georgia. While they slept, Janeika Murphy, a motel housekeeper and an acquaintance of Walker, surreptitiously entered the room and stole cash,

along with a cigar box containing marijuana and cocaine. Walker was "fuming" when he discovered that the cash and drugs were missing, and he spent the day investigating the theft. Later that evening, Walker received a telephone call, after which he informed his girlfriend that "he knew who had his drugs, and he was going to get them." *Walker*, 281 Ga. at 158 (1). Walker and Tate proceeded to Murphy's house on foot, where they forcibly removed Murphy from her home. At Walker's request, Green drove to Murphy's house, and, when she arrived, she observed Tate in the front yard holding Murphy at gunpoint. Murphy was forced into the vehicle, and Green, following directions provided by Walker, drove to a secluded area. Tate, Walker, and Murphy exited the vehicle, and Green was instructed to "go around the block and come back." Walker subsequently shot Murphy numerous times. At some point during the ordeal, Murphy sustained an injury consistent with being "pistol whipped," but gunshots to her head caused her death.

## II. Ineffective Assistance of Counsel During the Sentencing Phase

### A. Standard of Review

"An ineffective assistance of counsel claim must show that counsel rendered constitutionally-deficient performance and that actual prejudice of

2

constitutional proportions resulted." *Hall v. Lance*, 286 Ga. 365, 367 (II) (687 SE2d 809) (2010) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LEd2d 674) (1984)). "This Court accepts the habeas court's findings of fact unless they are clearly erroneous, but we apply the law to those facts de novo." *Perkins v. Hall*, 288 Ga. 810, 812 (II) (708 SE2d 335) (2011). Here, the habeas court's factual determinations regarding trial counsel's mitigation investigation, preparation, and presentation are supported by the record. Accordingly, the question for this Court is whether those findings are sufficient to support the legal conclusions that trial counsel rendered constitutionally deficient performance and that Walker was actually prejudiced by that performance. See *Hall v. McPherson*, 284 Ga. 219, 220-221 (1) (662 SE2d 659) (2008).

B. *Deficient Performance*

1. *Mitigation Investigation and Preparation*

"[T]he Supreme Court [has] 'emphasize[d] that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence' or even 'to present mitigating evidence at sentencing in every case.'" *Hall v. Lee*,

286 Ga. 79, 80 (II) (B) (1) (684 SE2d 868) (2009) (quoting *Wiggins v. Smith*, 539 U. S. 510, 533 (II) (B) (3) (123 SCt 2527, 156 LEd2d 471) (2003)).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U. S. at 690-691 (III) (A). "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U. S. at 527 (II) (B) (1).

When lead counsel Richard Allen learned that the mitigation specialist of his choosing was unavailable, he delegated responsibility for the sentencing phase of the trial to his co-counsel, Edward Clary. Allen reasoned that it would appear inconsistent if he advocated for Walker's innocence during the guilt/innocence phase of the trial but then asked the jury for mercy if it returned

4

a guilty verdict. Edward Clary was no stranger to developing mitigation. Clary testified in the habeas court that, in his previous capital cases, he had not used a mitigation specialist; instead, he had been the one to develop the mitigation. Clary explained, though, that when he "got into the Walker case [he] became aware that the [American Bar Association] had said their approved standard now required that [a defense team] have a mitigation specialist to assist the lawyers." In February 2004, Clary moved the trial court for funds to hire a mitigation specialist. In support of his motion, Clary argued that case law, as well as guidelines set out by the American Bar Association, indicated that "for a defense team in a death penalty case to go forth without the assistance of a trained, skilled, and knowledgeable mitigation specialist [would be] ineffective assistance of counsel on its face."[1]

Clary subsequently contacted William Scott to act as a mitigation specialist. Clary testified that Scott had been recommended by someone with whom Clary had worked in a previous capital case. At their initial meeting, Scott represented that he held a "Ph.D.," insisted that he be addressed as "Dr.

---

[1] But see *Hulett v. State*, 296 Ga. 49, 67 (5) (c) (i) (766 SE2d 1) (2014) (concluding, "as several other courts have, that the failure to hire a mitigation specialist does not necessarily demand a finding of deficient performance").

Scott," and represented that he had training and experience specific to capital cases. Scott's curriculum vitae, however, reflected only a general reference to participation in capital cases and did not indicate that he held a doctorate. Nonetheless, both attorneys were initially impressed by Scott. Clary testified that he took Scott "at face value" because of the fact that he had been recommended, and Allen testified that Scott "sold himself" to the attorneys and that they did not "vet" him. In April 2004, more than two years after Walker was indicted and approximately three months before Walker's original trial setting, trial counsel secured funding to hire Scott as a mitigation specialist. In May 2004, the defense team moved to continue the trial date on the basis that Scott needed additional time to conduct his mitigation investigation, and the trial was continued until late January 2005.

After retaining Scott, Clary delegated responsibility for developing mitigation to him. Clary explained that he deferred to Scott because he expected him to be a "mitigation manager and expert" and that he "expected [Scott] would do a far better job than he would do and would have all these records and documents." Clary expected that Scott would travel to locations where Walker had lived, work closely with Walker's family, acquire an extensive family

6

background, and secure appropriate records. In contrast, Scott testified during the habeas hearing that Walker's case was his first as a mitigation expert, that he "relied on counsel to sort of lead [him] as to what [his] role would be," and that he depended on trial counsel to obtain various records. Additionally, the evidence presented at the habeas hearing indicates that Scott did not, in fact, hold a doctorate. Although Scott testified that he disclosed his "limited experience" to trial counsel, Clary testified that he did not know that Scott did not have previous mitigation experience and did not know that Scott did not hold a doctorate.

From May 2004 through October 2004, Scott submitted periodic invoices detailing his work, and those invoices were submitted by trial counsel to the trial court for payment.[2] Scott's billing records reflect that he billed for eighty-two hours of work during this time period: twenty-six hours reviewing records related to the criminal investigation and proceedings; sixteen hours interviewing or evaluating Walker; fifteen hours conferencing or consulting with various members of the defense team; six hours for unspecified mitigation work; five

[2] We do not consider the billing records for the truth of the matter asserted; instead, we consider the records "as an indication of the information known to defense counsel at the time they made their decision[s] regarding mitigation strategy." *Hall*, 286 Ga. at 85 n.3 (II) (B) (3).

hours interviewing four members of Walker's family; four hours interviewing Walker's mother; four hours interviewing Walker's girlfriend; four hours preparing a report; and two hours preparing for a "psychiatric hearing."[3]

In his habeas testimony, Scott testified that he first interviewed one of Walker's aunts who lived in St. Marys, Georgia, and then, on two or three occasions, met with Walker's mother and other relatives in Atlanta. Scott recalled that it was Walker's "mother and grandmother [who] were the people [he] spent the most time with" and that there also "was an aunt in College Park who[m he] ... talk[ed] to often on the telephone about [Walker]." However, Scott explained that, while Walker's mother, Deborah Lee, was "cooperative" and "candid," she "seemed reluctant at the time to meet with [him]." Scott did not think that she was forthcoming or that she had "much to add to anything." Likewise, Scott testified that his conversations with the aunt in College Park "were more where she was just lamenting about [Walker's] situation rather than offering . . . any good information." In contrast, Lee testified during the habeas

---

[3] Scott also billed a total of 16 hours for "travel time" to St. Augustine, Florida, and to Atlanta, Georgia. Scott did not bill for work in November or December 2004, and, although he eventually billed for work in January 2005, those records were not submitted and approved until after Walker's trial.

proceedings that, although Scott asked "a few general questions" about Walker, he spent the majority of the time discussing "his role as a mitigation expert" and "did not ask any involved or detailed questions about [Walker's] life." Lee testified that she provided Scott with a list of Walker's schools and places of employment, and she recalled that she later located other records but that Scott never asked for them. According to Lee, she was not asked to provide a detailed account of Walker's life until the habeas proceedings.

Scott also testified in the habeas court that other family members had information about Walker but that he felt as if they did not want to get involved. Scott recalled that, during a group meeting, various family members left the room and would not participate. Scott also testified that, although various family members would promise to be available at a later time, "telephone calls wouldn't be returned, that kind of thing." Scott further explained that he did not contact any of Walker's previous employers because he did not think that Walker's work history was significant. Likewise, Scott testified that he attempted to contact unspecified non-family members but that those individuals had "moved on to other positions and couldn't be found, or were reluctant to speak to [him] and get involved."

9

In October 2004, approximately three-and-a-half months before trial, the defense team selected Earnest Miller, M.D., as its psychiatric expert. The defense team hired Dr. Miller based on Scott's recommendation. Scott testified that he wanted Dr. Miller on the case, at least in part because he "couldn't discover too much wrong with [Walker]" and could not "tease out" why Walker had committed the murder. Dr. Miller subsequently evaluated Walker. In his written report to trial counsel, Dr. Miller explained that Walker was "a product of a dysfunctional family and [that] [Walker's] father was a dependent user of street pharmacologicals." Dr. Miller also explained that Walker was aware of his father's use of illegal drugs, that Walker could recall physical altercations between his parents, and that Walker's father was murdered when Walker was a teenager. According to the evaluation, there was "a family diathesis of alcoholism" and there were substance abuse problems "in both first and second-degree relatives." In his report, Dr. Miller identified and detailed five areas for potential mitigation:

> a history of childhood exposure to a dysfunctional home environment and role modeling encouraging or suggesting intemperate use of street drugs; the impact of early loss of his father by traumatic means; the demonstrated ability to establish reasonably sustained and supportive relationships with females, and dependent

10

child; the absence of behavioral characteristics during childhood suggestive of conduct disorder which is a precursor of an anti-social personality; and, the presence of a severe personality disorder.

Dr. Miller explained that Walker "developed defenses" that were "self-defeating and led to maladaptive behaviors." According to Dr. Miller, Walker's difficulties likely resulted from "the environment of his critical development period." Dr. Miller opined that Walker's mother had to contend with the "disturbance" caused by Walker's father and that she "perhaps did not have sufficient interactive time for attention and emotional support of her son."

In early January 2005, Clary asked Scott to provide a written overview of his work. In response, Scott faxed Clary a half-page summary of his work and conclusions, along with four pages of sparse handwritten notes. Scott noted in his summary that he had conducted a "psychological test on Walker" but that the test was invalid, and he explained that he had "been unable to obtain Walker's education and medical history." Although Scott indicated in his summary that he generally found Walker to be "unremarkable," he suggested the following avenues for mitigation: "Walker's history as a good kid, the trauma of his drug dealing father's death, and his absentee mother during his teen years." Scott later sent Clary what amounted to a script for his anticipated testimony. The

11

script was approximately two-and-a-half-pages long, and, although it included approximately a dozen proposed questions and answers, only a few of them were designed to provide any significant detail about Walker. Scott explained during his habeas testimony that he never developed a mitigation theory "because there wasn't a lot of mitigation that [he] was able to discover," unlike another case in which he had discovered that a defendant had "walked backwards for the first four years of his life." In his habeas testimony, Scott acknowledged that there was nothing that the habeas court could examine, such as a report or a file, to review his mitigation work in the case.

In contrast, Dr. Miller prepared for trial a four-page outline supplemented with information that he obtained by speaking with Walker's mother and aunt. The following areas of "possible mitigation" were identified and explained in Dr. Miller's outline: history of childhood exposure to domestic violence and harsh physical discipline; history of early childhood exposure to alcohol and drugs; traumatic loss of a loved one (father); personality disorder and lack of competent treatment and follow-up; and genetic contributory factors. Dr. Miller recommended that Clary, in preparing Scott to testify, "focus upon some of the

consequences of violence being witnessed in the home in terms of problems in later bonding, forming trusts, feelings of insecurity, vulnerability, and the like."

As the trial neared, both Allen and Clary had concerns with Scott's level of preparation. The attorneys were concerned that Scott had not traveled as he had represented that he would, had administered only a single, invalid psychological test, had only basic notes, and had not produced a report. Allen testified in the habeas court that, although he was concerned about the level of preparation for the sentencing phase of trial, he was focused on obtaining an acquittal. Allen also believed that there was insufficient time to change experts and that there were "slim pickings" for mitigation specialists. Clary testified that he "thought maybe, some way, [he, Clary,] could pull it together" before trial, and he was able to secure some of Walker's school records in advance of trial. Although Clary testified that he worked with Scott and Dr. Miller to prepare their respective testimonies, he also testified that he followed the "outlines" that had been provided by the experts because he trusted their expertise.

Finally, trial counsel testified at the habeas hearing that they were unable to convince Lee that, should Walker be found guilty, she would need to testify

on Walker's behalf during the sentencing phase of the trial. Clary testified in his habeas deposition that he met with Lee in her home and discussed with her the importance of her testimony but that Lee was unwilling to testify. Clary acknowledged, however, that he did not push Lee, whom he described as a "tough-minded business woman," and that he "acceded to her position" because of her business acumen. Similarly, Allen testified in the habeas hearing that he spoke to Lee about the importance of her testimony but that Lee did not want to testify. Allen noted that he, like Clary, did not "push" the issue and that the only time that he could specifically recall asking Lee to testify was right after the jury announced its verdict of guilt. On the other hand, Lee testified during the habeas hearing that, although she did not testify at Walker's trial, she was willing to testify. According to Lee, she was led "to believe there was no need for any mitigation because [Walker] was probably going to be acquitted." Lee testified that, although she was doubtful that Walker would be acquitted, it was her understanding that "the doctor was the main and chief witness for [Walker]" in the event a mitigation presentation was necessary. Lee claimed that, after Walker was convicted, she was casually asked if she wanted to testify but that

14

"no one on the defense team ever conveyed to [her] the importance of [her] testimony or exactly what [she] should talk about."

*2. Mitigation Presentation at Trial*

Trial counsel presented the testimony of three witnesses during the sentencing phase of trial: Scott; Dr. Miller; and Joann Bishop, Walker's aunt. Scott was the first to testify. Scott explained that he evaluated Walker and that, during the course of his evaluation, he administered the Psychiatric Assessment Inventory, a "personality test." Scott explained, however, that the results from the personality test were unreliable because they were "exaggerated," but he did not specify why the results were exaggerated.

When asked about "areas of concern and importance" regarding Walker, Scott responded that he "hoped" that he could remember everything because he was testifying without his notes. Scott testified that he and Dr. Miller "basically found" that Walker was "flourishing" until the age of 15, when Walker's father was murdered. Scott also testified that Walker's father "had a drug and alcohol habit[,] which [Walker] was witness to," and that Walker witnessed violence in the home, which was "traumatic" for Walker. According to Scott, after the death of Walker's father, Walker "tried to assume the role as the father figure

15

in the home" but "wasn't prepared to do that at age 15, and that began a series of failures for Walker." Scott further testified that Walker failed to be a father figure, failed in school and at jobs, and "got in trouble with the law." Similarly, Scott explained that Walker had conflicts with his stepfather and eventually left home. Scott testified that it was his clinical opinion that Walker's lack of success was a result of "multi-factoral situations, but one of those factors was the death of his father." When asked to elaborate, Scott testified that "the impact of [Walker's] genetic background and . . . the environment he lived in created some characterological problems for [Walker] that he was just not able to overcome as an adult, and many people are like this." Scott concluded his direct testimony by stating that Walker was not "an evil person" but that he "didn't stand a chance" and that "the planets moved at such a way as to put [Walker] in a position at a time in his life where he just didn't make very good judgments about things."

On cross-examination, Scott explained that he did not administer any tests other than the invalid personality test and that, although the test was invalid, "many of the things that the test revealed . . . correspond[ed] to [his] clinical impressions," such as "substance abuse and chemical dependence." Scott also

16

testified that he reviewed Walker's school and medical records, that he conducted "an extensive psycho/social history" on Walker, and that he met with a number of Walker's family members. He acknowledged, however, that he did not gather information from non-family sources, such as "school officials," "friends or neighbors," or "teachers." Regarding his impressions of Walker, Scott testified on cross-examination that Walker "was doing well" until the death of his father, "which was a sentinel point in [Walker's] life." Scott explained that Walker "idolized" his father and "lost his anchor" after his death. According to Scott, Walker compensated for his father's death by attempting to take on a dominant role in his home, and, while this resulted in Walker's becoming protective of his siblings, it also resulted in conflict with his stepfather. Regarding Walker's exposure to domestic violence, Scott agreed with the State that Walker was doing well until the death of his father despite the violence in the home and that the violence "didn't appear to impact" Walker. Scott then explained that, while he could not say "definitively" or "absolutely" that the violence impacted Walker, "statistically and experientially" a "child that's exposed to violence in a home has to suffer from that in some way." Finally, Scott testified that he found no evidence that Walker suffered "physical

17

abuse or sexual abuse or emotional abuse, although . . . violence in any family home . . . causes some emotional abuse."

Dr. Miller testified that he evaluated Walker, spoke with Walker's family, and reviewed the results of an MRI scan of Walker's brain. According to Dr. Miller, Walker was a product of both his genetics and his upbringing. Specifically, Dr. Miller noted that Walker's father and cousin were heavy drug users and that, as a result, Walker was eight times more likely to become a drug user himself. In addition to this genetic component, Dr. Miller testified that Walker was acutely aware of his father's drug use and that Walker had discussed drug usage with his father. Likewise, Dr. Miller testified that, because Walker had family members who suffered from bipolar disorder, Walker had an "increased vulnerability and risk" of mental illness as compared to the general population.

Dr. Miller testified that Walker was exposed to family violence and that, according to Walker's mother, Walker would "cringe in fear" while witnessing the violence. Dr. Miller explained that it makes no difference whether a child is abused or whether a child witnesses the abuse, because the outcomes are identical. According to Dr. Miller, "when a kid sees abuse and no one explains

18

it to him or no one separates [him] from it," that child will develop problems such as drug usage and social isolation. Consistent with this expectation, Dr. Miller testified that Walker's mother reported "difficulties" with Walker "even earlier than the teen years" and that Walker was difficult to manage in his childhood and adolescence. Dr. Miller explained that, even though Walker witnessed his father "administer beatings" to his mother and was keenly aware of his father's involvement in the "drug culture," Walker still admired his father and loved him. According to Dr. Miller, the murder of Walker's father, which Dr. Miller testified occurred on Walker's sixteenth birthday, had an "immediate effect" on Walker. Dr. Miller testified that, following the death of Walker's father, Walker wept, raged, became extremely angry, experienced a personality change, became more rebellious, and attempted to assume a dominant role in the household. Dr. Miller explained that Walker's mother sent Walker to live with her sister but that Walker's aunt was unable to manage him.

Finally, Dr. Miller testified that, although Walker's MRI showed no abnormalities or problems, Walker suffered from substance abuse and substance dependence and exhibited characteristics of an unspecified personality disorder in the "Cluster-B category." Dr. Miller explained that individuals with

19

personality disorders are paranoid, defensive, impulsive, destructive, frustrated, and easily angered and that they can manipulate others, be narcissistic, and exhibit "psychopathic hysterical features." Dr. Miller testified that this type of individual turns to intoxicants to "escape pain." Regarding Walker specifically, Dr. Miller noted that Walker was a heavy user of marijuana laced with cocaine and that Walker used intoxicants as an escape and to "compensate for feelings of fear, inadequacy, guilt, not being able to protect his mother, not being able to succeed in school," and generally "not being successful."

On cross-examination, Dr. Miller acknowledged that Walker had two younger siblings, ages 19 and 23, who both were in school and "doing quite well." Dr. Miller also conceded that Walker had characterized his relationship with his father as "good" and his relationship with his mother as "wonderful." Dr. Miller was asked if Walker had indicated that he had been an honor roll student, and Dr. Miller responded that he was informed by Walker's mother that Walker had struggled in school. When pressed on the subject, Dr. Miller acknowledged that, had Walker made those grades, it would be inconsistent with the information that Dr. Miller had received. Dr. Miller was also asked whether Walker ever indicated that he had recovered from the death of his father within

20

a matter of days or weeks. Dr. Miller responded that Walker had never made that statement to him and that such a statement would be inconsistent with Walker's behavior following his father's death. Dr. Miller elaborated, stating that Walker acted out and was rebellious following the death of his father in response to the depression and loss. Dr. Miller also explained that Walker's ability to recover from the death of his father was stymied by the presence of a stepfather who was cold, aloof, and detached.

During redirect examination, Dr. Miller testified that the idea that Walker earned good grades until his father's death contradicted what he had learned from Walker and his family. Dr. Miller also testified that the idea that Walker had recovered quickly from the death of his father would have been inconsistent with Walker's behavior following the death of his father and inconsistent with his professional findings.

Finally, the defense presented the testimony of Joann Bishop, Walker's aunt. Bishop testified that, after Walker's father was murdered, Walker lived with her in St. Marys, Georgia. Bishop testified that, while in St. Marys, Walker helped out at her place of business, and she remembered Walker to be "very respectful" toward her and other family members. She also testified that,

although Walker eventually became "a bit much to handle," she did not have any "real problems" with him.  Bishop then testified that Walker was raised by a mother who "instilled the fear of God in him," and she asked the jury for mercy.

In its closing argument, the State argued that, although Walker's family had "problems," there was no evidence that Walker had been abused or that Walker had "a really rough upbringing in his home."  The State contended that Walker's "childhood wasn't that bad" and that Walker's brother and sister, who were raised in the same environment, "seem[ed] to be fine."  The State disputed that "[t]he planets moved in such a way that [Walker] made bad judgments," arguing that there was no evidence presented that Walker "never stood a chance" and arguing that, "for the most part," Walker "[c]ame from a good home."  The State characterized Walker as "just mean" and asserted that the murder, which was not borne of impulse or "heat of passion," was a "vicious" and "cold-blooded" execution that evidenced a "total, utter disregard for human life."  The defense argued that the State had not proven the various statutory aggravating circumstances.  The defense also argued that Walker should have the right "to supplement his life by some future acts of atonement" and that the

22

"atonement may only be exercised . . . in the cold, gray walls" of prison where Walker would be forever "cut off" from his family.

### 3. Analysis of Performance

The habeas court concluded, and we agree, that "[t]rial counsel inadequately investigated possible mitigation evidence and inadequately presented the mitigation case." As a threshold matter, we disagree with the Warden that, "in concluding that trial counsel was deficient in the investigation of evidence in mitigation," the habeas court "wrongly appropriated" the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and "graded" the performance of trial counsel based on those guidelines. As in another case,

> [w]e find no merit to the Warden's argument that the habeas court erred as a matter of law by relying upon the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. . . . Upon review of the habeas court's order and the record, we conclude that the habeas court
>
> > conduct[ed] an objective review of [counsel's] performance measured for "reasonableness under prevailing professional norms," [cit.], which include[d] a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." [Cit.]

*McPherson,* 284 Ga. at 221 (2) (quoting *Wiggins*, 539 U. S. at 524 (II) (B) (1)).

Acting on the perceived need to hire a mitigation specialist, trial counsel hired Scott without any investigation into his qualifications and then delegated to him responsibility for the mitigation investigation without sufficient supervision. Although trial counsel expected that Scott would be the mitigation "manager" and "expert," Scott believed that his investigation would be led by the attorneys. Even if these mismatched expectations were not immediately known to trial counsel, they should have become apparent. The majority of Scott's work was completed in the first few months after he was hired and, when "he couldn't discover too much wrong" with Walker, Scott recommended that trial counsel hire Dr. Miller. While Dr. Miller identified a number of possible avenues for mitigation, there is no evidence to suggest that Scott or trial counsel undertook an adequate investigation as a result of Dr. Miller's findings. In fact, Scott's billing records reflect that he interviewed various members of Walker's family for the first and only time months before Dr. Miller was hired. Although the record supports Scott's testimony that, at times, it was difficult to obtain information and records from Walker's family, Dr. Miller had expressly identified a number of avenues for mitigation related to Walker's family and

24

upbringing. Under these circumstances, encountering an unhelpful family should have led to *additional* investigation, not to its conclusion. See *Wiggins*, 539 U. S. at 527 (II) (B) (1) ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

Furthermore, by January 2005, trial counsel were aware that Scott had not traveled as promised, had not secured records as expected, had not followed up on Dr. Miller's recommendations, and had produced little work product. Scott's failings were apparent from his half-page summary, which showed that he had not secured or reviewed records and that he was relying on Dr. Miller's work, rather than his own, to reach his conclusions. Further, even though Scott reported that he was relying on Dr. Miller's work, Scott's summary should have alerted trial counsel that Scott and Dr. Miller had very different impressions of Walker. Specifically, Scott found Walker to be a "good kid" and generally "unremarkable," and he recommended that trial counsel focus on Walker's "absentee mother" and the death of Walker's "drug-dealing father." In contrast, Dr. Miller concluded that Walker came from a dysfunctional home, that Walker

25

was exposed to domestic violence and drug use, and that Walker had a family history of substance abuse and mental illness. We agree with the habeas court that, "at this point, counsel were aware that their mitigation specialist had not conducted much of an investigation" and that trial counsel unreasonably failed to request a continuance to allow for further investigation or take other remedial measures.[4] Although Dr. Miller followed up with Walker's mother and aunt in preparation for trial, his account of Walker's life provided, at best, an overview and was cause for further investigation.

Unsurprisingly, the circumstances of the mitigation investigation, including a lack of preparation and the competing conclusions about Walker, were evident at trial. The trial record reflects that Clary did not act on Dr. Miller's recommendation regarding Scott's trial testimony. Instead, he utilized Scott's prepared script, even though both trial counsel were concerned with Scott's investigation and even though the script, on its face, elicited very little meaningful information about Walker and contradicted Dr. Miller. The trial record also reflects that Scott was unprepared to testify. Scott's testimony

---

[4] Although trial counsel moved for a continuance shortly before the sentencing phase of trial, that motion was made in response to the State's questioning Dr. Miller's credentials, not because trial counsel sought additional time for mitigation investigation and preparation.

26

eventually devolved into opinions about Walker's characterological problems and the alignment of the planets. While these comments may seem innocuous in a cold record, Clary recalled that the "jury did not react well to [the] absurd commentary." Clary explained that "about three or four jurors look[ed] at each other like 'what's he saying that for,'" and Clary recalled that the normally composed trial judge looked startled by the testimony. Allen, too, believed that Scott's testimony was damaging, and both attorneys testified that heated words were exchanged with Scott outside of the courtroom following his testimony. The manner in which Scott's testimony was received by the court and jury is uncontradicted and, in fact, is corroborated by emails found in the habeas record which reflect that Scott's testimony was a source of conflict within the trial team even after the trial.

Dr. Miller's trial testimony, though more informed, was largely conclusory and was at odds with Scott's testimony. Specifically, Dr. Miller testified that Walker was affected by the domestic violence and that Walker had long-standing "difficulties" beginning well before the murder of Walker's father. Moreover, even though the murder of Walker's father was apparently a focal point of the mitigation presentation at trial, neither Scott nor Dr. Miller

27

accurately identified the age at which Walker lost his father and, in fact, gave inconsistent answers on the topic. Finally, while the evidence presented to the habeas court is conflicting, there is sufficient evidence to support the habeas court's conclusion that trial counsel failed to adequately advise Lee of the importance of her testimony and that, had trial counsel appropriately discussed with her the importance of her testimony, she would have testified.

We agree with the habeas court that this was not "a situation in which a reasonably prepared mitigation case [fell] apart upon presentation." Instead, it was "a situation in which grossly inadequate preparation" combined with "an unqualified mitigation specialist yielded a predictably poor result." In the end, the mitigation investigation in this case yielded little information about Walker, and that was evident by the mitigation presentation. In light of the foregoing, we conclude that trial counsel's mitigation investigation and preparation were not reasonable and that trial counsel's performance was constitutionally deficient. The question, then, is whether Walker was actually prejudiced by the failures of trial counsel.

*C. Actual Prejudice*

"To determine prejudice in the sentencing phase of a case challenging a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Lee*, 286 Ga. at 86-87 (II) (B) (4) (quoting *Strickland*, 466 U. S. at 695 (III) (B)). See also *Humphrey v. Morrow*, 289 Ga. 864, 867 (II) (717 SE2d 168) (2011) ("[A] reasonable probability of a different outcome exists where 'there is a reasonable probability that at least one juror would have struck a different balance' in his or her final vote regarding sentencing following extensive deliberation among the jurors." (quoting *Wiggins*, 539 U. S. at 537 (III))). In our review, we "must consider the totality of the available mitigating evidence in reweighing it against the evidence in aggravation, while being mindful that a verdict or conclusion with overwhelming record support is less likely to have been affected by errors than one that is only weakly supported by the record." *Sears v. Humphrey*, 294 Ga. 117, 131 (II) (D) (751 SE2d 365) (2013).

*1. Additional Mitigating Evidence Presented at the Habeas Hearing*

The habeas court concluded that, had trial counsel conducted an adequate

mitigation investigation, they would have discovered additional evidence in a number of areas. The habeas court's finding that such evidence was available to trial counsel was not clearly erroneous. Accordingly, we address as a matter of law the prejudicial impact of trial counsel's failure to discover that evidence for use at trial. We need not address all of the evidence presented at the habeas hearing, because we conclude that the prejudice resulting from the omission of mitigation evidence in those areas discussed below is sufficient to sustain Walker's claim.

### a. Domestic Violence Between Walker's Parents

Walker's mother, Deborah Lee, testified that her ex-husband and Walker's father, Greg Walker, "was a terribly jealous, paranoid, angry, and violent man." Lee characterized "the first roughly ten years of [Walker's] life" as a "'life of running' because [she] was always looking for ways to run away from [Greg Walker]." Lee explained that her altercations with Greg Walker began when Walker was approximately a year old and the family was living in California. According to Lee, the fights started with arguing, pushing, and slapping but then escalated to Greg Walker's punching her in the face. Lee testified that Walker "was there for every fight," and Lee recalled that Walker became scared of Greg

Walker and would be "very still and quiet" when Greg Walker was present. According to Lee, Walker "got to a point where he wouldn't play anymore" but "would sit in a corner and stare off into space."

This family situation did not improve when the family relocated from California to Lee's hometown of New Orleans, Louisiana. Lee testified that, when Walker was approximately two or three years old, the fighting intensified. Lee recalled that she began fighting back against Greg Walker and that the fights became "bloody." Lee detailed fights with Greg Walker that involved household items used as weapons, such as a glass soda bottle, ceramic banks, a pan of hot water, a frying pan, a drinking glass, an umbrella, and a "butcher knife." Lee testified that, after one particular fight, she required stitches and Greg Walker was left with a broken hand. In addition to injuries, Lee testified that the various fights resulted in property damage, such as a broken window, a broken-down door, and a hole in a wall. According to Lee, "[t]he fights were daily," and Walker responded by screaming, sobbing, running to his room, and climbing into his bed.

Lee testified that she left Greg Walker on a number of occasions, temporarily relocating to her parents' house or "running" to California, but that

31

she always returned to him. After several more years of abuse and household chaos caused by Greg Walker, Lee decided to leave for the "last time," but Greg Walker discovered Lee as she was attempting to leave. According to Lee, Greg Walker was able to "jump in the car" with Lee and the two children, and he drove the family to a levy, where he said they "were all going to die together." Lee testified that she believed that he would drive the family into the water and drown them all. According to Lee, she and the children begged him for their lives, and he relented and drove the family back home after being convinced that Lee would not leave. Shortly after the levy incident, Lee left with the children and filed for divorce. Lee and Greg Walker were officially divorced in mid-1986, when Walker was seven years old. Lee testified, however, that she continued to live in New Orleans and that Greg Walker continued to harass the family. Lee recounted an incident shortly after the divorce during which Greg Walker attempted to force his way into Lee's residence and Walker raced around the house, yelling in fear. In August 1987, when Walker was eight-and-a-half years old, Lee moved with the children back to California, though Greg Walker continued to have custody of the children during the summer months.

Lee noted that, because of the timing of the abuse and divorce, Walker's siblings "were never subjected or exposed to the same violence as [Walker]."

Other witnesses also testified in the habeas court regarding the violence between Lee and Greg Walker. Walker's sister, Latanya Gobin, who is approximately three years younger than Walker and was in medical school at the time of her testimony, testified that her earliest memory was of Walker consoling her during a physical fight between her parents. Joann Bishop, Walker's aunt who testified at trial, explained to the habeas court that she was aware that Greg Walker and Lee fought and that she helped Lee leave Greg Walker. According to Bishop, Greg Walker "wasn't going to let [Lee] leave if [they] hadn't done it behind his back." Meredith Tillman, also Walker's aunt, testified that she heard Lee and Greg Walker argue and observed injuries on Lee, such as bruises and scratches. Janis Holliday and Charles Haywood, both of whom were longtime friends with Lee, also testified regarding the domestic abuse. Both Holliday and Haywood testified that they observed injuries on Lee, that they heard Greg Walker threaten Lee, and that Lee left Greg Walker a number of times but always returned. Although Haywood acknowledged that he never actually observed the abuse, Holliday testified that she heard Greg

33

Walker cursing at Lee and that she observed him "grab [Lee] by the head and . . . yank her hair." According to Holliday, both Walker and Gobin were "adorable little kids" when they were away from home but were "withdrawn" at home.

The domestic violence testimony elicited during the habeas hearing is significant in a number of respects. First, the testimony is consistent with Dr. Miller's mitigation theories, which he communicated to trial counsel pretrial, and, thus, is precisely the type of testimony that Dr. Miller's theories should have prompted trial counsel to obtain. Second, the domestic violence testimony shows the detailed and consistent narrative that could have been presented at trial. At trial, only Scott and Dr. Miller testified regarding Walker's exposure to domestic violence, and their testimony was ambiguous and impersonal. Scott testified at trial that Walker witnessed "violence in the home" and that this was "traumatic" for Walker, but he pointed to no specific instances of domestic violence. Scott also testified at trial that the domestic violence "didn't appear to impact" Walker, and, more confusing still, he explained that he could not "absolutely" or "definitively" say whether Walker was "hurt" by the violence in the home, only that it was statistically likely. Dr. Miller, though less

34

equivocal about the impact of the domestic violence on Walker, still failed to relate the depth of domestic violence apparently present in Walker's home. On the other hand, Lee provided extensive details in her habeas testimony regarding the abuse, described numerous specific instances of abuse, and explained how it impacted Walker. The testimony of Gobin, Bishop, Holliday, and Haywood, while less specific, corroborated Lee's account and described the impact that the abuse had on Walker. Third and finally, the habeas testimony distinguished Walker's life experience from that of his two siblings and could have helped explain why Walker's siblings, in contrast to Walker, were "doing quite well" at the time of Walker's trial.

### b. *Physical Abuse and Extreme Physical Discipline*

Lee testified that Walker was a target of Greg Walker's abuse. Lee testified that Greg Walker called Walker "worthless and stupid," and she recounted an incident in which Greg Walker "whipped" Walker with a leather belt "for about 20-30 minutes," leaving welts all over his body.

Lee testified that she imposed extreme physical discipline on Walker and his siblings. She explained that she would "whip" them with a belt, an extension cord, a broomstick, a mop handle, or "whatever [she] could pick up."

35

Gobin echoed her mother's testimony regarding the abusive physical discipline, testifying that "nothing was off limits" and that Lee would use "whatever was in arm's reach," including shoes, a telephone receiver, an extension cord, and a tennis racquet. According to Gobin, the discipline left welts on her and her siblings. Gobin testified that, although she and her siblings were all physically disciplined, Walker "definitely got the worst of it." Gobin recalled an instance in which Lee locked herself and Walker in a room. Gobin could still see into the room, and she observed that Lee had Walker "on the sofa with [a] belt across his neck and was choking him." Gobin testified that she heard Lee tell Walker: "I brought you in this world and I'll take you out." Gobin testified that she and her brother "were just screaming at the door because [they] thought [Lee] was going to kill him" and that, as a result of that incident, Walker "had a gash, a chunk of flesh missing from his back."

Finally, Lee testified that, several years before Walker's father was murdered, she met and married Theophile Rhea. According to Lee, Rhea was verbally abusive toward Walker and his siblings. Lee testified that, in response to his comments about her children, she assaulted Rhea with a lamp and was arrested. Gobin echoed her mother's testimony about Rhea and characterized

36

him as "a jerk" who would instigate fights. Gobin testified that she was physically abused by Rhea, and she described a number of physical altercations between Walker and Rhea.

The habeas testimony regarding abusive corporal punishment is consistent with Dr. Miller's finding that Walker had suffered "harsh physical discipline," and the habeas testimony on this topic demonstrates what evidence could have been discovered and presented at trial in support of Dr. Miller's findings. Lee's testimony was largely corroborated by Gobin, whom the Warden chose not to cross-examine, and her testimony shows that, even though the violence between Lee and Greg Walker may have ended when Walker was eight, Walker continued to be exposed to abuse and violence in his home.[5] Further, Lee and Gobin's testimony again shows that Walker was treated differently than his siblings and thus helps explain why Walker's childhood and life experiences may have differed from that of his siblings. In contrast, at trial Dr. Miller made only a fleeting reference to Walker's exposure to "harsh behavior" by those in

---

[5] We note that, while the psychiatric reports from both Dr. Miller and the State's psychiatrist reflect that Walker reported to both men that he was never "physically abused," the Warden never explored the contents of the reports, the context of Walker's statements to the medical professionals, and whether Walker's statements were inconsistent with the recollections of Lee and Gobin.

his immediate family.  Although Dr. Miller explained at trial that it made "no difference" whether Walker was exposed to violence against others or was himself abused, Dr. Miller failed to explain or give detail concerning this conclusion.  Thus, while the jury may have understood from Dr. Miller that Walker was exposed to domestic violence and was perhaps abused, the jury received no testimony detailing the domestic violence or physical abuse like the testimony that was presented in the habeas court.

*D. Collective Prejudice*

"In weighing prejudice, we consider the collective prejudice from all of trial counsel's deficiencies." *Perkins*, 288 Ga. at 812 (II) (citing *Schofield v. Holsey*, 281 Ga. 809, 811-812 (II) n.1 (642 SE2d 56) (2007)).  The mitigation presentation at trial in this case was inaccurate, impersonal, included few details about Walker's life, presented competing conclusions about Walker, and resulted in testimony that was off-putting to the jury.  As a result of trial counsel's inadequate investigation and presentation, the State was able to argue persuasively to the jury that Walker's "childhood wasn't that bad," and, to bolster its argument, the State compared Walker to his siblings, who the jury had learned were "doing quite well."  However, had trial counsel acted on Dr.

Miller's recommendations, trial counsel would have discovered substantial evidence of Walker's exposure to pervasive violence in the forms of domestic violence, physical abuse, and abusive corporal punishment, which came from nearly every adult in Walker's life who acted in a parental role. This evidence could have been elicited from a number of sources, including Walker's mother, sister, aunts, and family friends, and these individuals could have explained how and why Walker differed from his siblings. The habeas presentation also demonstrated how a more complete mitigation investigation could have allowed trial counsel to present a consistent and detailed narrative that provided insight into Walker's life and decisions. Considering the combined effect of the deficiencies discussed above, we conclude that there is a reasonable probability that the absence of those deficiencies would have changed the outcome of the sentencing phase of Walker's trial.

Judgment affirmed. All the Justices concur.