NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 29, 2023

S23A0260, S23X0261. CALDWELL v. EDENFIELD; and vice versa.

BETHEL, Justice.

In 2009, a jury convicted David Edenfield for the 2007 sexual assault and murder of six-year-old Christopher Barrios, and the jury imposed a death sentence for the murder. Lead trial counsel, joined by other attorneys, represented Edenfield on direct appeal, and, in June of 2013, this Court affirmed Edenfield's convictions and sentences on direct appeal. See *Edenfield v. State*, 293 Ga. 370 (744 SE2d 738) (2013), disapproved on unrelated grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018).

Edenfield subsequently filed a petition for a writ of habeas corpus on December 17, 2014, which he amended on February 12, 2018. In his petition, he asserted that he was ineligible for the death

penalty because he is intellectually disabled and that trial counsel provided constitutionally ineffective assistance during his trial in several ways, including by failing to present evidence of Edenfield's alleged intellectual disability in the sentencing phase as mitigating evidence. He also contended that appellate counsel had provided ineffective assistance in several ways. The habeas court held an evidentiary hearing on the petition on November 18 to 22, 2019. In a final order entered on August 29, 2022, the habeas court denied relief on all claims except for the ineffective assistance of trial counsel claim concerning counsel's presentation of evidence of Edenfield's alleged intellectual disability as mitigating evidence in the sentencing phase. Based on that claim, the habeas court vacated Edenfield's death sentence.

The Warden has appealed in Case No. S23A0260, and Edenfield has cross-appealed in Case No. S23X0261. In the Warden's appeal, we reverse the habeas court's decision to vacate Edenfield's death sentence. In Edenfield's cross-appeal, we affirm in part; however, as explained in Division II (C) below, we conclude

2

as to Edenfield's claim regarding trial counsel's alleged deficiency concerning certain allegedly mitigating circumstances that additional findings of fact and conclusions of law are required, and we therefore remand Edenfield's case to the habeas court for further proceedings consistent with this opinion.

## I. *Factual Background*

Although we set forth extensive additional evidence below regarding Edenfield's intellectual functioning and other issues, we begin with a brief summary of the facts of his case. The evidence at trial showed that Edenfield's intellectually disabled son, George Edenfield, lured a six-year-old boy into his room and then penetrated the child orally and anally while Edenfield held the child down, attempted to penetrate the child anally, and rubbed his penis against the child and ejaculated on him. As George Edenfield then began to strangle the child after the child threatened to tell his family about the assault, Edenfield placed his hands over George's hands to see what it would feel like to participate in a murder. Edenfield's wife, Peggy Edenfield, masturbated as she watched the

attack.  Edenfield's intellectually disabled daughter, Minnie Edenfield, was not involved in the crimes.

## *II. Ineffective Assistance of Trial Counsel Claims*

An ineffective assistance of trial counsel claim requires a habeas petitioner to show that his or her trial counsel rendered constitutionally deficient performance and that actual prejudice of constitutional proportions resulted.  See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783-784 (1) (325 SE2d 362) (1985).  To show actual prejudice from any alleged deficiency or combination of deficiencies, a habeas petitioner must show that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith*, 253 Ga. at 783 (1) (citation omitted).  In reviewing a lower court's decision on such a claim, we accept the court's findings of fact unless clearly erroneous, but we apply the law to the facts de novo. *Strickland*, 466 U. S. at 698 (IV); *Head v. Carr*, 273 Ga. 613, 616 (4)

4

(544 SE2d 409) (2001). The question of prejudice in the context of the sentencing phase of a death penalty trial involves this Court's determining, and doing so de novo, whether there is a reasonable probability of a different outcome, which in the context of the sentencing phase means whether "'there is a reasonable probability that at least one juror would have struck a different balance' in his or her final vote regarding sentencing following extensive deliberation among the jurors." *Chatman v. Walker*, 297 Ga. 191, 205 (II) (C) (773 SE2d 192) (2015) (quoting *Wiggins v. Smith*, 539 U. S. 510, 537 (III) (123 SCt 2527, 156 LE2d 471) (2003)).

An ineffective assistance of trial counsel claim must be considered with a view to the impact of any deficiencies in trial counsel's conduct on the trial's outcome as a whole, and thus our discussion below addresses each of the individual claims of ineffective assistance in the appeal and the cross-appeal while always keeping in mind how the individual claims might relate to one another or build on one another. See *State v. Lane*, 308 Ga. 10, 15-16 (1) (838 SE2d 808) (2020) ("The United States Supreme Court

has told us explicitly that we must consider prejudice collectively in the context of ineffective assistance of counsel and *Brady*[1] prosecutorial misconduct claims.").

Upon a careful review of the trial and habeas records, we conclude that counsel did not perform deficiently in several respects and that, even assuming that trial counsel performed deficiently in the ways indicated in the discussion below, the absence of their deficiencies in this case would not in reasonable probability have led to a different outcome of either phase of Edenfield's trial. See *Strickland*, 466 U. S. at 697 (IV) (noting that a court need not address counsel's performance if an ineffective assistance claim can be denied based on a lack of prejudice alone); *Lajara v. State*, 263 Ga. 438, 440-441 (3) (435 SE2d 600) (1993) (same). See also *Ford v. Tate*, 307 Ga. 383, 406 (II) (C) (1) (835 SE2d 198) (2019). However, as discussed below in subdivision C, we conclude that the habeas court's final order fails to provide adequate findings of fact and conclusions of law to allow us to resolve some of Edenfield's claims

---

[1] *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

of ineffective assistance of trial counsel related to several categories of allegedly mitigating evidence, and we remand the case for consideration of those claims.

*A. Proving Intellectual Deficits in the Sentencing Phase*

The habeas court concluded that Edenfield's trial counsel rendered deficient performance in preparing and presenting evidence of Edenfield's intellectual deficiencies and that prejudice to his defense of constitutional proportions resulted from counsel's deficiencies as to the jury's sentencing choice. Below, we briefly discuss trial counsel's preparation for trial and explain our decision to assume that trial counsel performed deficiently under constitutional standards for the purpose of our overall analysis of this claim. Following that, we compare the evidence regarding Edenfield's intellectual functioning that was actually presented at trial with the evidence that Edenfield has presented in the habeas court and explain why we conclude that consideration of Edenfield's new evidence regarding his intellectual functioning would not in reasonable probability have caused the jury to impose a sentence

7

less than death.

## 1. *Assumption that Counsel Performed Deficiently*

From our review of the trial and habeas records, we have a fairly clear view of how trial counsel, particularly lead counsel James Yancey, conducted themselves. We know that counsel hired an investigator and a mitigation specialist.[2] And we know that the mitigation specialist prepared a written report, which must have been in trial counsel's possession at the time of the trial, given the fact that the report was disclosed by counsel to a psychologist who testified for the State. This mitigation report, along with mitigation witness interview summaries and a mitigation timeline, appears now in the habeas record, and it summarizes, among other things, what some of Edenfield's family members and other associates reported to the mitigation specialist, and it also summarizes Edenfield's school records, including his scores on various IQ and

---

[2] The mitigation specialist, Janann McInnis, testified at the habeas hearing that she had previously worked on 50 to 60 death penalty trials and on 50 to 60 death penalty habeas cases. We do note also, though, that she was incapacitated for some time shortly before Edenfield's trial.

other tests.

We also learn from the record that Yancey had a highly strained relationship with the trial court in the pretrial period of this case. As happened in other death penalty cases around that time, funding for criminal defense efforts was sometimes long-delayed, and Yancey complained loudly and often about the matter. The habeas record also reveals some communications between Yancey and several potential expert witnesses. The record shows that Yancey succeeded in obtaining an evaluation of Edenfield by Dr. Daniel Grant, a psychologist; however, Dr. Grant withdrew from the case once he realized that he had previously examined Edenfield, his wife, and his children in 1986 in connection with a Department of Family and Children Services ("DFCS") investigation into claims by the children that both Edenfield and his wife had been "fondling them, abusing them and having sexual relations with them." Yancey then communicated with Dr. Jane Weilenman, also a psychologist; however, Dr. Weilenman also withdrew from the case, apparently due to Yancey's failure to communicate properly with the

trial court about transporting Edenfield to the county jail in Savannah for her to evaluate him. Finally, about a month before the guilt/innocence phase began, Yancey received a recommendation for and hired Dr. James Stark, who testified at trial. However, Dr. Stark contended in his habeas testimony that he was never given a response to his pretrial request to Yancey for additional information about Edenfield.

In light of the habeas court's findings regarding trial counsel's deficient performance and the fact that the record is less clear on the question of the reasonableness of trial counsel's pretrial conduct[3]

---

[3] It is worth noting that were we to conduct a full analysis of the reasonableness of trial counsel's conduct in preparation for trial we would be required to consider the fact that Georgia law continues to place the burden on a criminal defendant to prove intellectual disability beyond a reasonable doubt in order to gain a full exemption from the death penalty in the guilt/innocence phase. See OCGA § 17-7-131 (c) (3), (j) (providing for a life sentence for any defendant who is convicted but can prove his or her intellectual disability beyond a reasonable doubt in the guilt/innocence phase of his or her death penalty trial); OCGA § 17-7-131 (a) (2) (as amended in 2017 to replace the term "mentally retarded" with the term "intellectual disability" and to renumber subsections but otherwise without making any change to the relevant definition). That burden might significantly inform the scope of reasonable trial strategies and decisions for the guilt/innocence phase when representing defendants, like Edenfield, with assessed intellectual capacity at or near the borderline of a diagnosis of disability. Meanwhile, a different strategic calculation would apply in deciding whether, despite the burden of proof on

with regard to the issue of Edenfield's intellectual functioning than it is regarding the impact of any deficiencies in that conduct, we assume in our discussion below that trial counsel performed deficiently in preparing and presenting evidence regarding Edenfield's intellectual functioning.

2. *Prejudice Suffered in the Sentencing Phase Regarding Intellectual Functioning*

In weighing the prejudice to Edenfield in the sentencing phase of his trial, we compare the evidence in that original trial with the evidence presented in Edenfield's habeas proceedings. Below is first a summary of the relevant evidence presented at Edenfield's trial, then a summary of the relevant evidence presented in Edenfield's habeas proceedings, and then finally an analysis of whether there is a reasonable probability that Edenfield's new evidence would have changed his sentencing phase verdict if it had been presented at his original trial. See *Smith*, 253 Ga. at 783 (1).

---

this issue during the guilt/innocence phase, presentation of evidence of the defendant's intellectual challenges at *some* point during the trial might nevertheless have strategic value as a means of gaining sympathy with the jury in the sentencing phase.

*a. Evidence Regarding Intellectual Functioning Actually Presented at Trial*

Our summary here of the evidence presented at trial related to Edenfield's sentencing would be incomplete without first noting that the jury had already heard perhaps the most influential piece of evidence regarding Edenfield's intellectual abilities as part of the State's proof of his guilt, which was his video-recorded interviews with investigators. In these interviews, Edenfield carried on lengthy conversations about the crimes, offering plausible explanations for how he was not involved and refusing to submit to a polygraph examination. He spoke with some mumbling and the use of idioms and often at a fast pace, but he appeared at all times to fully understand what was being discussed, and his responses to the investigators were cogent.[4] The interviews with investigators

---

[4] Although we have reviewed these video-recorded interviews again as part of this appeal, we note that this Court's members in 2013 shared a similar assessment of Edenfield's intellectual capacity displayed in the interviews, stating on direct appeal: "But our review of the recordings of his statements reveals that he had adequate capacity to understand the context of the assurances [given to him by investigators] and that he did, in fact, understand that context." *Edenfield*, 293 Ga. at 375 (2) n.7.

would not suggest the presence of an intellectual disability to a layperson.

Dr. Stark testified in the sentencing phase of trial that he had examined Edenfield on two occasions "to see what his mental functioning was, to look at competency issues, criminal responsibility issues and in general to assess his mental state." He explained: "We did clinical interviewing, we did observations, I looked at several CDs or DVDs of interviews, investigative interviews. I've looked at lots of materials concerning history, work history, school history." Dr. Stark also explained that he gave multiple psychological tests over the course of 8 hours, including the Minnesota Multiphasic Personality Inventory ("MMPI"), the Slosson Intelligence Test, the Wide Range Achievement Test, a mental status test, and the Rorschach test. He testified that Edenfield's school records showed an IQ in the 70s, that Edenfield tested with an estimated IQ of 83 in Dr. Stark's use of the Slosson test, and that Edenfield's IQ was "probably in the 80s, which is low average." Dr. Stark explained that Edenfield was "reading at a fifth grade level,

13

spelling at a fifth grade level and solving math at a second grade level."

Dr. Stark explained that he had given "the newest version of the MMPI" where "the computer [wa]s reading the questions out loud to" Edenfield while he looked at the questions. He then testified regarding the MMPI scores:

> He is out of the normal range on scales measuring paranoia and schizophrenia. If I drew a grap[h] of these scales you'd see that the highest points are in paranoia and schizophrenia. No signs of alcohol or drug problems. No signs of self pity or self blame. But a lot of signs of social introversion, quietness unto himself and signs of notions of persecution and grandeur and ideas of reference and suspicion, fears that others are talking about him and feeling that he's got a bad lot in life. So we're getting multiple signs of paranoid schizophrenia. On the other scales measuring bizarreness, he is way, way up there, about the ninety-ninth percentile. And so he's checking some items that appear incredibly bizarre. He has low self esteem, social discomfort, multiple fears.

He then explained these particular findings a bit further.

Dr. Stark next explained that Edenfield "had not [had a] very productive work history or school history," that he had "kind of plod[ded] along," that he "may have been the wage earner in the

family," and that he had "a boring kind of life style" but "had a job." Dr. Stark described Edenfield's long tenure both at civilian jobs and in the military as "demonstrating that he c[ould] have stability," and he noted that Edenfield had been with his wife for "thirty, forty years" and "seemed to have some kind of commitment to [his] family even though they appeared quite disturbed."

Dr. Stark explained that responses on the Rorschach test "are hard to fake and hard to control" and that Edenfield's responses showed no signs of malingering, showed signs of "[i]rrationality," showed "poor contact with reality, that there may [have been] feelings of split – like with schizophrenia," and showed that Edenfield's symptoms might not be obvious to an observer but were "just below the surface." He also explained that Edenfield's drawings of himself with his family suggested that "he s[aw] Peggy[, Edenfield's wife,] as dominant and George as somewhat stronger than himself."

Dr. Stark's recommendation for treatment of Edenfield included:

[R]eduction in conflicts, reduction of pressures, reduction of stresses, some work on sexual kind of problems within that whole household. Reducing the general trauma, we're getting signs of post traumatic stress. I have the impression that the family is very traumatized probably about a whole bunch of things. Reduction of that quote, "craziness," end of quote, in his environment would help a great deal. And stabilization of the family and continued stability of work and appropriate kind of psychotropic medication.

Finally, Dr. Stark explained that he had reviewed the report of the State's psychologist, that the report was based on merely a short interview and no testing, and that it did not identify any psychosis like he had himself identified by obtaining "much more data."

Maggie Carroll, Edenfield's older sister, testified that Edenfield had been a normal child who was never disrespectful to his parents, was mentally "slow," did not have access to special education, suffered a head injury as a child and never received treatment because of the family's poverty, was a good father and husband who cared for his family, had two children who were both mentally "slow," took care of his mother with whom he was very close, worked every day that he could, went to church, had never

been in trouble, and was a good person who did not deserve the death penalty.

Testimony from Carson Shattuck, who had met Edenfield 25 years earlier in the National Guard, showed that Edenfield had served in the Army and Army Reserves before enlisting in the National Guard, worked as a cook in the National Guard, was very "slow" but was dependable and loyal, obtained a driver's license for the first time while in the National Guard, required assistance to do some of his military paperwork, became a sergeant only because the military discontinued the grade of specialist, did not become a sergeant based on merit and would not have reached that grade in more modern times, earned several medals, was trusted and was willing to do whatever was asked, would sometimes have to be told several times to do a task because he was "slow," usually understood the command structure but sometimes needed it explained to him, was always together with his family and appeared to have a good relationship with them, had children who were also "slow," and was someone with whom the crimes seemed inconsistent.

Testimony from five witnesses showed that, while he was jailed pretrial, Edenfield was a good inmate who complied with the rules and never caused problems, respected authority and complied with directions, did not receive any disciplinary reports, was in protective custody only for his own safety, was always friendly, adapted well to incarceration, and was not a threat to other inmates. Edenfield's former probation officer testified that Edenfield completed his unsupervised probation without any incident.

Testimony from Delores Anderson, who had known Edenfield for 25 years as a relative by marriage and had been his boss for 15 years, showed that Edenfield was a good father, took his son to baseball games, went to "gospel sings," took care of his mother, was a "very good" and "dependable" worker, was responsible for duties like taking out the trash, cleaning the parking lot, and cooking, "could pretty much do whatever [she] needed him to do," did not work the cash register only because she had a practice of having the female employees do that job, would work both late and on his days off when asked, "might [have been] a little slow," and had to be

18

helped in learning tasks sometimes.

Testimony from Florence Dees, who had known Edenfield since 1975, showed that he treated his mother very well, was concerned about paying bills and caring for his family, and was a good and respectful neighbor. She stated: "I don't think [Edenfield] could do brain surgery or anything but, I mean, he took care of his family as good as he could. . . ." She explained that Edenfield would come to her house to pay her mother-in-law what he owed to her on his mortgage and that they "had to get on [him] a couple of times but [that] he got pretty good with paying on time."

The State then presented testimony from its own psychologist, Dr. Philip Barron. Dr. Barron explained that he had reviewed the video-recording of Edenfield's final police interview, his school records, his work records, Dr. Stark's report, and a "mitigation report." Dr. Barron also interviewed Edenfield, and he consulted with the health counselor at Edenfield's jail, who described him as not "requiring any mental health services or medication" and as being "the best behaved inmate in the detention center." He testified

that he considered Edenfield's video-recorded interview to be a "strong indication" that he "demonstrated no signs of any kind of significant mental illness." He noted that Dr. Stark's report stated that Edenfield was not intellectually disabled, with an IQ somewhere in the "low 80s," and he stated that that view "seemed consistent with Mr. Edenfield's presentation." He testified that the testing results in Edenfield's school records "were all in the borderline range" and that one "evaluator who had seen him at some point . . . obtained average, an average IQ" He opined: "So I thought low average [IQ] seemed about right." He noted that it would have been "highly unusual" for someone to have such a well-documented record ranging from school to work to the military and yet have no indication of mental health services if the person indeed "had a serious mental illness." Regarding Dr. Stark's conclusion that Edenfield suffered from paranoid schizophrenia, Dr. Barron testified:

> That's totally inconsistent. A person with paranoid schizophrenia[,] as Dr. Stark said[,] in a florid state, which seems a fully manifested psychosis, they're going to

be exhibiting disorganized speech, prominent hallucinations, they're going to be very delusional. They're going to have an obvious problem in interacting with the world in a reality based manner. It's going to be quite obvious.

He concluded:

[T]here's nothing about his mental health picture in terms of either intelligence or any kind of mental illness that would get in the way of him being able to differentiate right from wrong just like any other normal person.

### b. New Evidence Presented in the Habeas Court

As noted, the evidence described above was presented at Edenfield's trial. We turn now to the consideration of the evidence offered in the first instance in the habeas proceeding. At the hearing in the habeas court, Edenfield presented live and affidavit testimony from Sharon Phillips, Edenfield's sister-in-law. She testified that her sister Peggy, Edenfield's wife, met Edenfield "during special education class" and that Peggy "was in special class because she was mentally challenged, mentally disabled." When asked if Edenfield appeared to have a mental disability, she responded: "Yes, he did. It was obvious. . . . He was always childlike childish,

21

slow in the same sense that my sister was, very slow, very – took everything literally." She stated that neither Peggy nor Edenfield had a driver's license at first and that Edenfield only got one "probably in his 30s" after being taught to drive by her father over the span of "a decade and a half" and going "regularly to take the test." She recounted that Edenfield would exaggerate when talking about his duties while serving in Vietnam, even saying outrageous things like "that he was the helicopter pilot that flew President Nixon from Hanoi to Washington on a regular basis." She explained that her mother did a great deal for Peggy and Edenfield, including taking them to pay bills, teaching them how to pay bills, teaching them how to plan what grocery items to shop for, and teaching Edenfield how to cook, which he did for his family "a lot" once Edenfield's mother "moved out and they had the whole house to themselves." She testified that her mother was at Edenfield's house "every day" doing chores for them, like helping with the children, painting their house, putting down linoleum flooring in two rooms, and teaching Peggy to do household chores. She testified that she

helped Peggy and Edenfield find their new home when the family was forced to move because of George Edenfield's sex-offender status and that she helped them decorate once they moved in. Phillips also indicated that her brother would sometimes help Peggy and Edenfield financially and that her brother was present when Peggy and Edenfield signed the lease for their new home, which she had to explain to them. She testified that her boyfriend "had to hook up the washer and dryer" for Peggy and Edenfield and then later had to set their heater for them when the season changed. On cross-examination by the Warden, she acknowledged that Edenfield never received disability benefits from Social Security, "was able to keep a job," was in the National Guard for about 20 years, wrote letters to her from jail (but she described them as "all one sentence, no space between words"), and read the Bible but did not generally read "[a]s a hobby."

Rhonda Carmichael gave both live and affidavit testimony in the habeas court. She explained that she "first met [Edenfield] in elementary school." She described him as being "[d]isruptive" and

23

having a hard time focusing and as being "in the lowest" reading group. She stated that he had a hard time following instructions, and she explained: "The most things that I remember were going to lunch getting out of line, not following direction, not resting after lunch, getting up out of your seat when you weren't supposed to." She stated, "He was pretty ostracized by the other children," probably because he was "different," had trouble following directions, and had "extremely poor hygiene." She explained that she was the human resources director at a hospital where Edenfield later worked as "a houseman," which she described as "the lowest job on the totem pole." She indicated that his hygiene remained poor as an adult. She stated, "Because I've always known David to be mentally challenged, it is my opinion that he would have never moved up the ranks at the hospital." Finally, she explained that he was fired from his job at the hospital when he was absent without explanation after he was incarcerated on a charge she did not specify.

Phoebe Brunswick testified that Edenfield came to work at Southeast Georgia Medical Center "in '92 to '93." She explained that she worked at the hospital as an "[e]nvironmental service supervisor" and was Edenfield's boss. She stated that Edenfield was responsible for things like collecting trash, mopping, and stripping and refinishing floors in his assigned area. She explained that he "was slower as far as going to do [a] task and getting it done," that he sometimes needed reminders to do things like putting out the sign for wet floors, and that he required more supervision than her other employees. She acknowledged that her reviews of him in his employment record mostly indicated "good," with just one entry in his record indicating "very good," and she explained that there was a higher category for "excellent" and described the category of "good" as meaning that "they completed their work, didn't have any real issues with them." Finally, she stated: "When I first met him . . . I could tell that – I mean, I'm not a genius, but I could just look and see there was a difference in him. Like I said, eye contact. He just got his paper [with work assignments] and went up to the floor, you

25

know."

Mary Gail Tanner gave live and affidavit testimony indicating that she had worked with Edenfield at Burger King and then at Wendy's, starting when she was 15 years old, and that she "considered him like a grandfather." She testified: "Even back then, it was obvious to me that [Edenfield] was very slow and had a mental disability. . . . I've always thought of him as a child in a man's body." Regarding his work duties, she stated: "He was like the porter, maintenance, when you do, like the maintenance part of the job." She described the maintenance portion of his job as involving things "such as changing the light bulbs." She explained that she or another employee "would stay on top of him and make sure he had enough" hamburgers being made when he worked on the broiler during the lunch rush and that, when he was cleaning, she "just stayed on top of him and checked behind him when he had done it and ma[de] sure it was in a timely fashion." Tanner explained that Edenfield was sometimes sent to the nearby Walmart to buy supplies but that he "needed clear instructions" beforehand. She

26

claimed that he was unable to work the register because it was "too multitasking" and that he could not make salads because it "required something where you had to measure individually." On cross-examination by the Warden regarding Anderson's trial testimony about why Edenfield had not worked the cash register, Tanner admitted that such decisions were up to Anderson.

Mark Newman testified both live and by affidavit. He explained that he had worked for DFCS and had "investigated at least two cases concerning David and Peggy Edenfield and the children, George and Minnie," with the first "related to child neglect" and the second "related to sexual abuse of the children and sexual involvement of family members." He explained that he had been informed by school professionals that Edenfield and his wife were "mentally challenged." He stated:

> All of the Edenfields – David, Peggy, Minnie and George – were very mentally impaired. Minnie didn't have the cognitive ability to understand that she needed to put clothes on before she went outside. George wasn't much better. . . . David had very serious mental impairments, but unlike others in his family, he was employable.

27

He stated that Edenfield and Peggy appeared not "to recognize that the behaviors of the children or themselves were causing harm or potential harm" and appeared "unable to protect the children from others in the community that may prey upon them." He explained that his investigation encompassed accusations about Minnie's being "victimized sexually by her mother, brother, cousin, and neighbor," and he testified: "There were allegations that David may have also been involved, but I was never – I never found evidence to support that. . . ." He added:

> But the Edenfields did not seem to have the same morality as others, that they were more – functioning on a more – and I hate to say primitive, but more on a physiological level where if something was pleasurable and didn't hurt, it didn't matter.

On cross-examination by the Warden, he explained, "[O]ne of my subordinates had a third investigation that they did where actually [Edenfield] was named as a perpetrator in that one as well."

Jan Vogelsang gave lengthy live and deposition testimony in the habeas court based on her review of records and based on interviews of Edenfield and "17 family and non-family members in

28

person." She was a clinical social worker who conducted a "psychosocial assessment" of Edenfield with "a focus toward any behaviors, any signs, any symptoms that would have been consistent with a diagnosis of intellectual disabilities." She testified that she found Edenfield to be "different," that he has "language difficulties," that he seemed to have an "impaired" understanding of "concepts having to do with relationships," that he struggled with the "flow of conversation," and that he would break into unintelligible phrases when talking about religion. She summarized his school records, including the fact that he was retained in the first grade, struggled in the second grade, fell behind in the third grade, was socially promoted from the fourth to the fifth grade, repeated the fifth grade, was socially promoted to the sixth grade, "was put in the eighth grade on condition and had a social promotion to the ninth grade," repeated the tenth grade, and then entered a newly-created special education program in the eleventh grade and turned 20 years old in that grade. She reported that, although she was qualified to do so, she was not asked to render a diagnosis regarding the level of

29

Edenfield's mental functioning. Nevertheless, she summed up her

opinions on the case this way:

> The conclusions that I came to in Mr. Edenfield's case
> were that his life history is consistent with – and can be
> characterized by behaviors that are consistent with
> intellectual disabilities, and that the lack of intervention
> in this case, both with him and with his family, had a
> devastating effect on the family in that they never
> received – well, Mr. Edenfield never received formal
> specialized services from the community on a long-term
> or meaningful basis that could have made a difference.

The vast remainder of her testimony was essentially a recapping of

and commentary on lay testimony and notations in various records,

matters that we discuss elsewhere more directly.[5]

Dr. Kristin Fiano, a neuropsychologist, gave live and

deposition testimony in the habeas court. She testified that, based

on her review of the records and her evaluation of Edenfield, she

concluded that "he meets the criteria for mild intellectual disability."

She reported: "He talked about paying rent and utilities, doing

---

[5] Regarding testimony like that of Vogelsang, we remind the parties in such cases that "[a]n expert must *not* be permitted to serve merely as a conduit for hearsay." *Whatley v. Terry*, 284 Ga. 555, 565 (V) (A) (668 SE2d 651) (2008) (emphasis in original).

grocery shopping, clothes shopping and reported that he was able to drive." Nevertheless, she discounted this self-report: "Well, I felt like it was likely that he did do some of those things at a basic level. Based on the record, it seemed that he was also receiving a fair amount of assistance in performing those tasks." She stated:

> [D]uring my interview with him and during the evaluation process itself, what struck me immediately and throughout the process was that his speech style tends to be very concrete, he uses limited vocabulary, tends to repeat certain phrases over and over, he tends to be tangential, and I needed to direct him quite a bit.

Dr. Fiano explained that she administered the "WAIS-IV, which is the Wechsler Adult Intelligence Scale, Fourth Edition," that Edenfield's IQ was "71, which is at the 3rd percentile," and that, based on the Standard Error of Measurement, there was a 95 percent chance that his IQ fell somewhere from "68 to 76." She also administered the Wide Range Achievement Test, testing Edenfield at the fifth grade level in reading, fourth grade in spelling, and third grade in mathematics. She stated, "The DSM [Diagnostic and Statistical Manual] even talks about mild ID [intellectual disability]

31

at a fifth or sixth grade level." She explained that she had interviewed five people regarding Edenfield's adaptive behaviors and that she found him to have deficits in each of the three categories of "Conceptual, Social and Practical." She also administered tests about Edenfield to four persons, with Shattuck's test, depending on how "some ambiguity" was resolved, showing "a score that was at the 2nd or 4th percentile," with Chaney's test showing "a score that was at the 10th percentile," with Phillips's test showing "an overall score that was 71, which was at the 3rd percentile," and with Anderson's test showing a score of 71 without the work section included and 78 with it included. On another test, the Vineland, Phillips and Anderson both scored Edenfield in the "2nd percentile," while Carroll scored him "at the 30th percentile." Dr. Fiano discounted Carroll's score, however, claiming that some of her responses "would directly contradict each other" and that "sometimes the basis for her opinions seemed inconsistent with the record to be spurious information." Dr. Fiano administered the Adaptive Behavior Assessment System ("ABAS") test to Edenfield,

and she testified that his self-score "was also in the average range, 96."

Dr. Fiano noted that the Georgia Department of Human Resources had administered the Role Functioning Scale to Edenfield in 1980, and she reported the result: "He was rated marginally productive, marginally self-sufficient, marginally functioning with immediate social network and marginally effective interactions." From an incident report by the Brunswick Police Department, she read: "Investigation reveals sexual activity among family members, including father with children. . . . Entire family is retarded, some more severely than others." She also read from a petition for deprivation that had been filed in the Juvenile Court of Glynn County: "Both George and Minnie allege that they have been fondled and sodomized by their father, David Edenfield. . . . These children are mentally retarded and cannot protect themselves." From Edenfield's military records, Dr. Fiano highlighted "a GT score of 67," and she stated: "There is literature to indicate a correlation between this General Technical Scale and the WAIS. . . ." She also

33

read from Edenfield's military record:

> That after review of this soldier's records, this soldier failed cardiovascular screening and has received marginal NCOERs [evaluations] by this chain of command. He no longer represents the caliber of individual needed for the aggressive Georgia National Guard.

Dr. Fiano noted that Dr. Grant, as part of his involvement during a DFCS matter, had administered the Peabody Picture Vocabulary Test to Edenfield and had obtained a score of 100; however, she added: "It's not an IQ test. Specifically it is a measure of receptive language, and language has consistently been one of his stronger areas on assessment." She also noted that Dr. Stark, Edenfield's expert at trial, had administered "the Slosson Intelligence Test which is more of a screening measure [that] heavily emphasizes crystalized knowledge, verbal skills" and that "[h]e scored in the low average, I believe 83." Finally, she discussed the Flynn Effect, which posits that the population performs better on aging IQ tests over time and that scores may be reduced to compensate for this effect; however, she also acknowledged that

34

some studies, at least in another country, have shown a more-recent opposite effect. On cross-examination by the Warden, she acknowledged from Edenfield's school records scores of 77 in 1959 and 78 in 1960 on a mental maturity IQ assessment, along with a score of 69 in 1961 on a Hermon-Nelson IQ assessment.

Dr. Jane Weilenman gave live, deposition, and affidavit testimony in the habeas court. Dr. Weilenman was the psychologist whom trial counsel contacted but was unable to use, probably due to trial counsel's miscommunication with the trial court, and she testified based on her post-trial interviews of Edenfield and her review of his records and the other material gathered by his habeas counsel. She stated that, in her opinion, Edenfield had "mild ID [intellectual disability]"; however, she later, when asked directly if she were making a diagnosis, said: "No." Regarding Edenfield's police interviews, she stated: "[I]t was displayed that he was suffering – or should I say he was encountering confusion at times, he needed clarification at times during the interrogation over something [sic] that were very simple." Under cross-examination by

the Warden, she admitted that she was not doing intellectual assessments at the time of Edenfield's trial and that the most she could have done for trial counsel would have been to suggest that he hire someone else to do such testing. But she maintained: "But if someone else had made [a diagnosis of intellectual disability], I could have concurred with them."

Dr. Janice Laurence, a psychologist, gave live and affidavit testimony. She testified that, at the request of the Department of Defense, she had studied a military program called Project 100,000 and had testified to Congress about it; she also wrote a book on the subject. She explained that Project 100,000 was a program that started as a result of a shortage of soldiers for the Vietnam War, and it brought "low-aptitude people" into the military, particularly the Army. She testified that she was able to determine from Edenfield's Army identification number and from a box checked on a particular form that he had been drafted as part of Project 100,000. She stated that persons from the category that Edenfield likely belonged to in military classification, Category 4, "would be people on the WAIS

36

who would score in the 70's or maybe low 80's." She indicated that persons below this category were barred by law from being admitted into the military, even during Project 100,000. She acknowledged that Edenfield's National Guard records showed him as being in Category 3, which is composed of persons more intelligent than Category 4. However, she dismissed the test score that placed him in this category on the basis that it was obtained using an "old version" of the relevant test with answers whose secrecy "could have been severely compromised" and given by recruiters to test takers. She also found this more-recent score to be too great of an improvement from the score she "inferred" that Edenfield had received when he entered the Army during the war. She disregarded positive reviews in Edenfield's military record as being the result of "grade inflation" and the fact that "he wasn't given any high-level jobs to do." She also downplayed his final rank in the National Guard of E-5 as being a "Specialist 5" rather than an officer in that same pay grade, thus making him someone with "no supervisory responsibility."

Michelle Schwartz gave live and affidavit testimony in the habeas court. She explained that she was the owner of a company that offered support services to intellectually disabled persons but was not qualified to diagnose intellectual disability and had not met with Edenfield, his family members, or any of the other witnesses who gave affidavits about his background. Nevertheless, she stated that she had reviewed "the affidavits and assessments and additional information" and had reached the opinion "[t]hat his adaptive skills [we]re commensurate with an individual who has mild intellectual disabilities." On cross-examination by the Warden, she admitted that some of the affidavit testimony contradicted some of her assumptions in reaching her opinion, including things like the degree of "natural supports" Edenfield had in his work and living environments. She also acknowledged the many positive reviews that Edenfield had received in the military, but she stressed that the affidavits about his time in the military were "very clear" about the "natural supports" he had enjoyed there.

38

Joel Davis gave live testimony explaining that he "was a social worker and mitigation specialist that assisted with [Edenfield's] case" at the time of his trial. He explained that he was assigned by the Capital Defender's Office to travel "to Brunswick to work on this case 48 hours before trial" and that he knew nothing at that point about the case. He testified that "information was limited" for him about the case because, although he was "unaware at that time," there were some sort of "existing conflicts" involving the Capital Defender's Office[6] and that "they were trying to basically build a wall between [him] and the Capital Defender's Office." He stated that, once he arrived in Brunswick, he received assignments from the investigator working on the case, Shannon Hayes, including "finding witnesses, subpoenaing witnesses, people that had not been interviewed, things of that nature." He was privy to the "mitigation report" that had been prepared by Janann McInnis, but he thought that "it wasn't as in depth as what [he] would normally prepare."

---

[6] This potential conflict appears to involve the fact that the Capital Defender's Office also was representing George Edenfield.

39

However, we note that Davis presented nothing in his habeas testimony speaking to Edenfield's actual mental functioning.

Shannon Hayes, "a fact investigator with the Georgia Capital Defender," also testified in the habeas court regarding her work on Edenfield's case. But she, like Davis, testified only to the process of trial preparation and added nothing substantive to the evidence regarding Edenfield's intellectual functioning.

Dr. Karen Salekin, a psychologist, testified in the habeas court that she had reviewed the Stanford-Binet IQ test that the Warden's expert, Dr. Glen King, had administered to Edenfield. She testified: "I identified both scoring errors as well as administrative errors." She gave specific examples of responses from Edenfield that she would have scored lower than Dr. King had, such as her giving Edenfield zero points for defining "lend" as "[g]ive somebody something like money or something like that." Based on her rescoring of as much of Edenfield's test as was possible given the test's format, Dr. Salekin opined that Edenfield would have received a 78 rather than the 81 as scored by Dr. King. She also criticized

the starting point on the test chosen by Dr. King for Edenfield's testing, claiming that Dr. King's starting point might have inflated Edenfield's score and stating: "It would have been prudent, particularly in a capital murder case, when you have – life and death is at stake here to be much more cautious than beginning at the age of 18. . . ." Finally, she discussed the Flynn Effect, which is the inflation of IQ scores on aging tests based on the supposedly increasing intelligence of the general public, and she stated that her score of 78 for Edenfield would become a 73 after accounting for the Flynn Effect. However, she acknowledged during cross-examination by the Warden that some scientific literature has posited that the opposite effect has more recently occurred.

James Yancey, lead trial counsel, testified at length both live and by deposition. But, as his testimony concerned the process of developing and presenting Edenfield's defense at trial, it sheds little light on the question of the prejudicial impact of the alleged deficiencies committed by Yancey and his co-counsel.

41

Dr. Stark, the psychologist who testified for Edenfield at his trial, gave additional affidavit and deposition testimony in the habeas court. He discussed his administration of the Slosson Intelligence Test, on which Edenfield had scored an 83. He explained that it was a "brief measure of IQ" rather than "the long version of IQ testing like the WAIS or the Stanford-Binet," but he maintained nevertheless that "[i]t usually correlates well with the Wechsler [WAIS]." He seemed to stand by his prior diagnosis of schizophrenia, explaining again that Edenfield's MMPI test results were "purely typical of a psychotic kind of condition," specifically "paranoid schizophrenia." Dr. Stark stated that, while he could not recall when he received them, Edenfield's school records showed behavior that "was more typical of somebody who was – was intellectually disabled." His affidavit testimony, which he testified that he had not written but had read, stated more directly: "Based on the record before me today, I concur with the opinions of Dr. Kristin Fiano and social worker Janet [sic] Vogelsang that David Edenfield has [an] intellectual disability."

Delores Anderson, Edenfield's former boss who, as recounted above, also testified on Edenfield's behalf at his trial, gave affidavit testimony in the habeas court. She stated, "I am no expert on mental retardation, but I always understood that [Edenfield] was mentally slow." She then stated, in some contradiction to her trial testimony: "For example, I never assigned [Edenfield] to the cash register. [He] was not capable of handling the register, certainly not quickly." She described Edenfield's duties as including washing pots and pans, putting up stock, and working the broiler. She stated: "I didn't assign [Edenfield] to making sandwiches often because it was a fast paced position and [he] couldn't keep up." She also stated that Edenfield had poor hygiene and required more supervision than her other employees. Finally, she stated, relevant to an assessment of his driving abilities: "He would give me rides to [and] from work if I asked."

Josephine Berry gave affidavit testimony that she had worked for DFCS and had had contact with the Edenfield family "in the late 1980s." She stated, "All of them were mentally retarded. David,

43

Peggy, and their children, Minnie and George." She added, though, "David was the most capable one of the Edenfield family, but he was still very limited." She stated that she was involved with two complaints involving the Edenfield family, "first in 1985 and again in 1988," explaining:

> Both complaints involved allegations of sexual abuse and neglect. I don't recall having contact with the Edenfields related to the first complaint, which doesn't name David, only the second one, which does.

She stated that the Edenfield home had a "bad odor," that the housecleaning was poor, and that the children did not have clean clothes and had head lice. She also stated:

> I understood the family's alleged problems with sexual boundary issues to stem from their limited mental capacity. Sexual impulsivity and boundary violations are common among people with impairments in intellectual functioning. None of them were able to control their impulses or understand sexual boundaries like people who were not impaired.

Ann Brunswick gave affidavit testimony explaining that she had been Edenfield's supervisor at a hospital "Environmental Services Department . . . in 1992 and 1993." She stated: "[Edenfield]

44

was mentally challenged and slow. It took him longer to do his work than it did other employees. Once he got the hang of a task he did fine, but he could be forgetful. You had to remind him what to do and keep an eye on him."

Maggie Carroll, Edenfield's older sister, and Gart Carroll, Edenfield's nephew, both gave affidavit testimony, but the only statements relative to Edenfield's intellectual functioning regarded how the Edenfield family had appeared to go "downhill" after moving to their new home, how Edenfield and his wife Peggy both were "slow" and their children even "slower than them," how Edenfield had a long work history, and how the Edenfield family had poor hygiene.

Charles Chaney gave affidavit testimony explaining that he was Edenfield's "direct supervisor in the Georgia Army National Guard and ha[d] known him for many years." He stated: "[Edenfield] always seemed slow to me. It took him a little longer to do things than it did other guys under my command." He stated that he "never assigned [Edenfield] cooking tasks because he

45

couldn't handle the job," that Edenfield "would not have been able to follow recipes," that Edenfield "was one of the weakest guys under [his] supervision from a mental standpoint," and that Edenfield "wasn't a guy [he] could trust to handle many things on his own." He stated that Edenfield was good at tasks like "peeling and cutting potatoes" and making tea and that his "main job in the Guard was setting up for mealtimes and cleaning up afterwards." He did state, however, that Edenfield was assigned "the task of driving a military vehicle to transport materials" accompanied by "another Guardsman" to help him load and unload the vehicle. He described Edenfield's rank of E-5, which was just below his own rank of E-6, as being "a courtesy or complimentary rank, commonly handed out to those who might not have been higher rank material, but who were otherwise dependable and reliable or hardworking, like David." He explained that he gave Edenfield good ratings but that they "were not always an accurate representation of how he truly performed." He stated:

My ratings on David's evaluations were inflated with regard to his leadership skills, and his ability to provide effective instruction to his subordinates. I generally gave him 4s or 5s in these areas, when David did not provide instruction or direction to anyone, and only had subordinates in the sense that he outranked other Guardsmen. David didn't supervise anyone.

He concluded: "David did complete the tasks assigned to him efficiently, but again, these were simple tasks. It is true that David was a dedicated and enthusiastic soldier."

Zoann Covington testified that she was Edenfield's fifth grade teacher. She stated:

He was a special needs student who had to learn how to get along in a regular class room. He exhibited an odd behavior that I've never forgotten over the years: when he was upset or didn't succeed at a task, he would walk over to the concrete block wall of our classroom and bang his head against it.

Finally, she stated that she "socially promoted" Edenfield to the sixth grade.

Florence Dees, who also testified for Edenfield at his trial, gave affidavit testimony in the habeas court. She stated that she had regular contact with Edenfield because her mother-in-law owned the

house he lived in and Edenfield would come with his wife and children to pay the rent in cash. She stated: "Both Peggy and David were mentally limited and immature. Peggy was very limited, even more than David." She stated that Edenfield and his wife relied a great deal on his mother "to help them with basic tasks like cooking, paying bills, shopping, and keeping the house clean." She added: "David was able to hold down a job but he also needed [his mother's] structure and support. David depended on [his mother] to reason things out for him."

Neal Dees, the husband of Florence Dees, gave affidavit testimony in the habeas court. He stated, "David was mentally retarded in my opinion." But he added, "Peggy was much slower than David, and their children, Minnie and George were really retarded, too." He then added further: "[Peggy] was worse off than David mentally, so David had to stay on her to get her to do things around the house. I remember hearing David holler at Minnie and George to take a bath." He stated that Edenfield "was naïve and gullible" and "didn't really have the wherewithal to do stuff on his

48

own" but "had to be instructed and followed up with." He added: "I was angry about the murder and it mystified and angered me to think that David might have been a part of it."

Chester DePratter, Peggy Edenfield's brother, also gave affidavit testimony. He stated, "Peggy has always been special and different, meaning she has always been mentally impaired, and David is very similar to her in this way." He added, "I have always thought that David was also mentally retarded." He stated that his parents "helped David and Peggy pay their rent on a regular basis," "put a new roof on their home[,] and helped them with car payments." He stated that Edenfield's mother "helped them, too."

Dr. Daniel Grant, who was the expert who withdrew from working on Edenfield's case once he realized that he had previously evaluated the Edenfield family for DFCS, gave affidavit and deposition testimony in the habeas court. He explained that, as part of that previous DFCS case, he had administered the Peabody Picture Vocabulary Test to Edenfield and that Edenfield scored 100 on it. He stated:

49

> The Peabody is not designed to provide a full and accurate measure of global intellectual functioning, and in fact it is only a moderately good predictor of performance on a comprehensive intelligence test, such as the Wechsler Adult Intelligence Scale (WAIS).

Although his affidavit did not further address his report for DFCS, the report is part of the habeas record and showed that, in addition to the screening score of 100 for Edenfield's IQ, Dr. Grant tested Peggy Edenfield's IQ as 75, George Edenfield's IQ as 44, and Minnie Edenfield's IQ as 41. Regarding Edenfield, the report stated, "He is also accused of molesting both children and having penile penetration with Minnie." It also stated, revealing the relative condition of Edenfield's intellectual function as compared to his wife's functioning: "It is also important to note that Mr. Edenfield has to go grocery shopping with his wife because she is unable to do this task by herself. He also cooks three to four suppers during the week." The report recounted accusations that Edenfield sexually abused George, but the report stated that this accusation was not credible for various reasons. Nevertheless, the report concluded differently regarding the accusations by Edenfield's daughter:

50

I feel that Minnie's description of the sexual molestations, poor supervision and possible physical abuse are quite convincing, as was her explanation using the sexually explicit dolls. I feel it is quite likely that she has been molested and feel that she is able to explain this molestation fairly convincingly in court.

George Randy James also gave affidavit testimony in the habeas court. He stated that he "dated David Edenfield's sister in law, Sharon Phillips, for about 7 years, from about 2002 until about 2009." He stated about the Edenfield family, "They were all mentally slow." He added, "Peggy had the mind of a 6 year old, and David wasn't much better." He stated: "Even though David was mentally retarded, David was the head of the family. He always worked." He explained how he once had to help the Edenfields move their thermostat setting "from cool to heat" and once "helped them hook up their washing machine." Regarding Edenfield and his mother, he said: "He took care of her the best he could. She was slow like the rest of them though. She had really bad hygiene." He stated:

The pretrial investigator also has a note saying that I said David is highly functional, which is misleading. David is

51

only highly functional when you compare him to everyone else. I'm no expert, but to me, David is mentally retarded, too, just not as bad as the others. You could send David to the store to get something and he'd be able to do it. The others couldn't do this. David could drive, and the others couldn't. David was the smartest one in his family group, but that isn't saying much.

Michael Keach, Edenfield's nephew, also gave affidavit testimony. He stated: "He was a good uncle, but he wasn't too bright. Really, he acted more like one of the kids than a grownup." In support of that statement, he recounted how Edenfield would play games with him. He described once "riding in a garbage truck that [Edenfield] drove" and how Edenfield "would have to line the truck up with the dumpster so he could lift the dumpster and dump it into the truck." He added, though, "There wasn't anything hard about it, you just had to pull a few levers in the truck." Finally, he stated:

> It was pretty obvious to me that David wasn't right mentally. He didn't comprehend things like most folks. He was functional, but very limited in intelligence. He did simple work at Jekyll Island Authority [where the trash truck was], and I've never known him to have jobs that required a lot of skill.

Alan Kittrell gave affidavit testimony explaining that he, like Edenfield, served in the Army in Vietnam as a "Field Wireman." He stated:

> Edenfield seemed goofy. He wasn't the sharpest tool in the shed. He seemed challenged, and it seemed to me that he had intellectual problems. He was just so slow. . . . He was squirrelly and gullible, and easily misled. He was a strange guy, kind of bizarre.

Kittrell explained the switchboard duties that he and Edenfield both performed:

> There wasn't anything complicated about operating the switchboard. . . . When a call came in, a bulb on the board lit up. The bulb was associated with a specific cord that retracted from the machine. The caller would tell you who he wanted to talk to and you would connect the retractable cord to the hole associated with that person. If I'm remembering right, there were names written on the board, so it was easy to know where to plug the cord in. You'd then crank the wheel on the machine to ring that person so he'd know to pick up.

Janann McInnis, Edenfield's pretrial mitigation specialist, gave affidavit testimony in the habeas court. She stated, "[I]t was apparent to me during my contact with him that he is impaired." She added: "I interviewed several of David's friends, family

53

members, and co-workers. Their descriptions provided a picture of David that was consistent with intellectual disability/mental retardation." Her remaining testimony related to the pretrial investigation process and did not speak directly to the question of Edenfield's intellectual functioning.

Tom Moree also gave affidavit testimony on Edenfield's behalf in the habeas court. He stated that he had been a probation officer and that Edenfield "was on [his] caseload as a result of his 1994 conviction for the crime of incest." When he visited the Edenfield home on a probation visit for George Edenfield, he noted that the home was not neat, had a bad odor, and had "stale food left out." He stated: "[I]t appeared to me that the Edenfields might have had some mental challenges at some level. It appeared that George probably had the worst challenges."

Donald Pittman gave affidavit testimony explaining that he had worked with Edenfield in the Army National Guard "for about 2 years" in the "Mess Section." He stated:

> David was cook by title, but he never cooked. No one trusted David to cook. He couldn't follow the recipe cards to do any actual cooking. He just didn't have the mental competence to do this. He made sweet tea and was our gopher, meaning we sent David to get items we needed, food and supplies mostly. David's elevator didn't go all the way to the top. He was kind of cuckoo. So was his wife, Peggy, and his children, Minnie and George.

He explained that "when [he] first met David he didn't have a driver's license" but instead rode a bicycle. He stated that Edenfield "was socially inappropriate and awkward" and that his "hygiene was really poor."

Carson Shattuck, who also testified at Edenfield's trial, gave affidavit testimony in the habeas court. He explained that he assigned Edenfield "to Food Services because it seemed a good fit for David's abilities – jobs that were simple to do and that didn't require a lot of thought." He added, "I did not think he was capable of skilled or complex work." He stated that Edenfield "was rarely, if ever assigned cooking tasks" but instead did simpler tasks like peeling potatoes and washing pots and pans. He stated: "[Edenfield] didn't drive when he first came to the Guard, and although it took a while,

several guys in the Guard taught him how to drive and he was able to get his license." He explained that Edenfield "on more than one occasion" was assigned to drive a two-and-a-half ton truck 65 miles to Fort Stewart to get supplies for weekend drills, and that, "[b]ecause two (2) days of food for roughly 100 men was needed, it was always a two (2) person job." Shattuck stated that, despite records showing that Edenfield had subordinates, Edenfield was only senior to "the Kitchen Police" and was never seen by him "providing direction to these guys" or being "in charge of anyone." He stated that he thought that Edenfield's rank of E-5 "was a complimentary or courtesy rank, i.e., he achieved this rank not based on ability, but because everyone liked him and he tried so hard." He stated further:

> [Edenfield] attained noncommissioned officer status, but [he] was not noncommissioned officer material and was only classified as such because of the change in ranking system [to eliminate the grade of specialist]. Everyone who knew [him] understood that he was not capable of taking on command responsibilities commensurate with his rank.

Shattuck stated that he "would often 'flower up' or enhance" his

56

evaluations of Edenfield, but that Edenfield "was by no means a smart soldier in the Guard."

Albert Sigler, who worked at a group home for intellectually disabled persons where Edenfield's intellectually disabled daughter was eventually placed after Edenfield pleaded guilty to committing incest with her, gave affidavit testimony in the habeas court. He stated: "[Edenfield] immediately struck me as intellectually disabled." He stated about a letter that Edenfield had written to his daughter: "I was not able to read [his] handwriting or make sense of the letter. It looked like a child had written it."

Carolyn Sills, Edenfield's cousin, gave affidavit testimony that stated: "[Edenfield] always seemed different to me, even then. By 'different' I mean: something wasn't right in his mind. I wondered about some of the stuff he said. The things he said seemed childish for his age."

Darlene Waters gave affidavit testimony explaining that she had been married previously to Edenfield's brother-in-law. She stated that Peggy Edenfield's parents "were concerned that

57

[Edenfield] wouldn't be able to take care of [Peggy]." She stated that Edenfield had poor hygiene, that he "had problems with personal space and boundaries," and that he would "sometimes brag, exaggerate his accomplishments, like a child." Finally, she stated that Edenfield's mother would buy groceries for him and his family at the military store "to guarantee that they had enough food."

Dr. King, the psychologist who evaluated Edenfield for the Warden during his habeas proceedings, gave deposition testimony. He tested Edenfield's IQ at 72 on the WAIS test and at 80 on the Stanford-Binet test. When asked about a statement in his report that there was "absolutely no indication from an IQ standpoint that [Edenfield] functions in a disabled range on intellectual disability" and asked whether Edenfield "falls into that 67-to-77 range, applying the SEM [standard error of measurement]," he replied:

> Not for me, because I took all of the – both of the intelligence instruments that I gave as the totality of the circumstances, and he scored quite a bit higher on the Stanford-Binet. So looking at both of those together, it is my opinion that he does not function in the disabled range. . . . And all the previous testing was also in the 70s. So, it was all quite consistent. . . . [A]ll of these tests

58

are at 70 – low 70s to a higher [sic] indicate the presence of what we call construct validity. And what that means is that, when you have the same tests or similar tests given over a lengthy period of time and you wind up with the same results, it actually indicates that he's not – the person is not functioning in the intellectual disability range. He is in the borderline range.

Dr. King testified that his testing showed that Edenfield functioned at a fourth-grade reading level, a third-grade spelling level, and a second-grade mathematics level, and he acknowledged that such test results "can be" consistent with having intellectual disability. He took issue with some of the testing that Dr. Fiano gave to several persons who knew Edenfield, however, stating:

Two of them were extremely low; so low that, you know, they raised serious questions about giving zeros, because he was not able at all to do certain tasks [according to them] that I think he had no difficulty with.

He then emphasized the fact that Edenfield's "sister actually filled out the Vineland indicating that he had fairly good adaptive functioning, that he was functioning in the average range." Regarding Edenfield's manner of speaking, he testified: "He – to be quite honest with you he talks as a person that I would describe

59

probably as borderline. . . . Not average, but not intellectually deficient." Dr. King defended his decision to begin his testing on the Stanford-Binet test at the point specified for adults, stating, "It's important just because that's the standardization for the test." He added about whether starting at a lower point is ever appropriate:

> Sometimes in clinical judgment, if you have somebody who you are assessing and it's quite obvious that they are functioning at an extremely low level, you might start at a lower age. But those situations are pretty rare.

He explained that he had done so only once in 200 to 300 tests, with someone who had already undergone IQ testing and scored less than 40.

Dr. Stephen Price gave deposition testimony in which he discussed a report that he prepared for Edenfield's habeas proceeding. He testified regarding his interview of Edenfield: "He has a – an odd way of communicating. He's very – he rambles a great deal, and very circumstantial and tangential." He testified that the "mini mental status examination" that he gave Edenfield "corroborated the – the mild intellectual deficiency that – that he

60

has." He acknowledged that there was no evidence that Edenfield had ever received disability benefits from Social Security or that he had ever been diagnosed previously as being intellectually disabled.

### c. *Analysis of Prejudice*

Having recounted in some detail both the evidence presented in the trial court relevant to the jury's assessment of Edenfield's intellectual functioning and the new evidence on that topic presented in the habeas court, we turn to assessing the likely effect that the new evidence would have had on the jury's deliberations at Edenfield's trial if it had been presented there. And here we are concerned specifically with what effect such evidence would have had on the jurors' exercise of discretion in recommending a sentence of death or of life, whether with or without parole, once they had already determined beyond a reasonable doubt that Edenfield was guilty and had also determined that the State had proven beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. See OCGA § 17-10-30 (b) (providing the aggravating circumstances that, once found, will authorized the discretionary

61

decision by a jury to recommend a death sentence for a murder).[7] As we noted above, in reviewing a lower court's decision on such a claim, we accept the lower court's findings of fact unless clearly erroneous, but we apply the law to the facts de novo. *Strickland*, 466 U. S. at 698 (IV); *Carr*, 273 Ga. at 616 (4). In that context, the category of "findings of fact" is somewhat limited in scope (e.g., did something happen or not regarding counsel's investigation of the case), while the relevant conclusions of law involve the questions, as fact-driven as they may be, of (1) whether counsel performed

---

[7] On direct review, this Court conducted a statutorily mandated review of the statutory aggravating circumstances found by Edenfield's jury and held:

> The jury found beyond a reasonable doubt that the murder in this case was committed during the commission of an aggravated battery in that the anus of the victim was seriously disfigured, and that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and depravity of mind. Although it is a close question whether the evidence was sufficient to sustain the finding of aggravated battery, there was more than enough evidence to sustain the finding beyond a reasonable doubt that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and depravity of mind. Even if the finding of aggravating battery were set aside for insufficiency of the evidence, the death sentence in this case still would be valid because it is supported by another statutory aggravating circumstance that the evidence fully supports.

*Edenfield*, 293 Ga. at 392 (13) (citations omitted).

deficiently and (2) whether the defendant suffered prejudice of constitutional proportions. Id. In the de novo review for prejudice, such as here where we have already assumed the existence of deficient performance by counsel, we attempt to look at all of the evidence through the eyes of the trial jurors and then ask ourselves whether "'there is a reasonable probability that at least one juror would have struck a different balance' in his or her final vote regarding sentencing" if the jurors had heard the evidence presented in the habeas court in addition to the evidence that they actually heard at trial. *Walker*, 297 Ga. at 205 (II) (C) (2015) (quoting *Wiggins*, 539 U. S. at 537 (III)). In conducting that de novo review for prejudice here, we conclude that, although the evidence of Edenfield's intellectual functioning presented in the habeas court was far higher in volume than the evidence presented at trial, it was not meaningfully different from the trial evidence and would not in reasonable probability have led any of the jurors to have selected a sentence other than the death sentence they actually recommended.

At both the trial and the habeas proceedings, the evidence showed that Edenfield received a variety of IQ scores over the years, with one at 69, many in the 70s, and several in the 80s or higher. Notably, even the State's own expert acknowledged at trial that Edenfield had consistently received IQ scores in the "borderline range," meaning the range just above mild mental intellectual disability. Likewise, at both the trial and habeas proceedings, expert testing showed Edenfield's reading skills to be at the fourth or fifth grade level, his spelling skills to be at the third, fourth, or fifth grade level, and his mathematics skills to be at the second or third grade level. While Dr. Fiano testified in the habeas court, as no expert had at trial, that she had concluded that Edenfield suffered from "mild intellectual disability," even she acknowledged that some of his testing was inconsistent with that diagnosis, with some measures showing him functioning as high as in the "average" range. And, on the other hand, the Warden's habeas expert highlighted that, over the long-term, Edenfield's IQ scores were

consistently in the 70s and above[8] and that he demonstrated the ability to navigate a simple but productive lifestyle. Thus, we conclude that the expert testimony presented in the habeas court, particularly considering the competing nature of some of it as to Edenfield's precise IQ and as to a relevant formal diagnosis, would not have substantially altered the jury's appraisal of Edenfield's intellectual functioning.

Also at both the trial and habeas proceedings, the evidence showed that Edenfield was regarded by his family and other associates as being mentally "slow," worked menial jobs his whole life, and required help to learn even his simple job responsibilities. This evidence included trial testimony depicting him as simply "plod[ding] along" in a "boring kind of life style" in his work and needing assistance even in his basic responsibilities, testimony that

---

[8] We note that the United States Supreme Court has stated: "Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor." *Hall v. Florida,* 572 U. S. 701, 714 (III) (A) (134 SCt 1986, 188 LE2d 1007) (2014).

was not substantially enhanced by the similar habeas testimony. Notably, too, some of Edenfield's new habeas testimony even depicts Edenfield as being a provider of assistance, rather than just a recipient of it, with him caring for his mother and caring for his more-severely impaired wife by keeping her focused on tasks, shopping for her, and cooking for her. We acknowledge that the habeas evidence includes testimony, albeit much of it only by affidavit, from Edenfield's family members and associates about his limited adaptive behaviors through the years. Yet, we are struck that the characterization of much of this testimony by Edenfield's several experts in his habeas proceeding repeatedly places an interpretation on that testimony that fails to align with the original testimony.[9] Instead, that lay testimony, when considered in its own

---

[9] For example, Vogelsang, Edenfield's clinical social worker whose findings were relied upon by Edenfield's other experts, sought to downplay the fact that Edenfield was sometimes assigned to drive a military truck, hastening to add that "[h]e was never allowed to do it alone." However, lay testimony showed that Edenfield drove a two-and-a-half ton truck 65 miles to Fort Stewart and needed a passenger to accompany him simply because the amount of food being picked up made it "a two (2) person job." Similarly, Vogelsang downplayed Edenfield's operation of a telephone switchboard as being "very simple" and involving merely "pull a cord out, plug a cord in," while

right, depicts someone who suffered intellectual challenges but was able to lead a generally independent household, nonetheless.

Further evidence of Edenfield's difficulties was presented at both the trial and habeas proceedings through evidence showing that Edenfield did not reach his final rank in the military based on merit and would not have reached that level under current standards, that he was "slow" but dependable in his military duties, that his duties while in the National Guard were limited to working as a cook, that even with his limited duties he required assistance because of his "slowness," and that he required assistance to complete simple tasks like filling out military paperwork. The testimony on this topic in the habeas court was different from that in the trial court in volume and in some degree of specificity, particularly regarding the exact program under which Edenfield had been admitted into the Army during the Vietnam War, but those differences do not alter our analysis here, particularly considering

the description of the operation in lay testimony from Alan Kittrell showed it to be more involved.

67

the fact that some of the records presented in the habeas court actually suggested that Edenfield tested and operated at an average level of functioning.

Finally, we note that, at both proceedings, the evidence included lengthy video recordings of Edenfield being interviewed by investigators, with him appearing somewhat odd in demeanor but able to cogently participate in the interview. In this context, we again emphasize that our task here is to consider what effect the new habeas evidence likely would have had on the jurors' purely discretionary selection of a sentencing verdict. In rendering such a verdict, the jurors, especially after hearing competing expert testimony, would have given great weight to the hours of video-recorded interviews of Edenfield, where the jurors could see firsthand what his mental capabilities were. Thus, we likewise weigh those video recordings heavily in our analysis of prejudice here.

Overall, unlike the evidence in the habeas court, the evidence at trial could have been viewed by the jury as casting Edenfield in a

68

favorable, mitigating light:  someone who worked hard, overcame his mental "slowness" to a large degree, kept his family together the best he could, and served his country in a humble role, yet in a diligent fashion.  In some contrast, the habeas evidence attempts to characterize Edenfield as someone whose mental "slowness" made him somewhat incompetent in his work and military duties.  While that characterization might also be considered mitigating by the jury, it also may well have undercut the mitigating effect of the different light cast on Edenfield at trial as someone who accomplished some important things.  And importantly, in the process of developing an alternative theory of mitigation in the habeas court, Edenfield introduced some severely aggravating evidence, particularly evidence that he was investigated by DFCS after both of his children accused him of sexually molesting them as minors and the finding of the psychologist who investigated the children's claims that the daughter's claim bore indices of credibility.

69

In sum, the evidence presented in the habeas court was not so much more mitigating compared to the evidence at sentencing that it would have created a reasonable probability that any of the jurors would have exercised his or her discretion differently so as to vote for a sentence less than death in this case.[10]  See *Humphrey v. Morrow*, 289 Ga. 864, 867 (II) (717 SE2d 168) (2011) (citing OCGA § 17-10-30, which provides that a death sentence may be imposed only upon a unanimous jury recommendation, yet finding no prejudice from counsel's deficiencies).  Accordingly, we reverse the habeas court's judgment in which it vacated Edenfield's death sentence on the basis of this claim.

### B.  *Seeking a Verdict of Guilty but Intellectually Disabled*

Above, we discussed at length the evidence presented in Edenfield's trial regarding his intellectual capacity as compared to

---

[10] As a matter of course, we frequently consider published opinions with similar fact patterns when considering the potential prejudicial effect of trial counsel's actual or presumed deficiency.  With respect to this enumeration and the one that follows, neither Edenfield nor the Warden has pointed us to any cases sufficiently similar to be helpful to our analysis.  Nor have we discovered any on our own.

the evidence presented in the habeas court, and in that discussion we concluded that the habeas evidence would not have had a constitutionally significant effect on the sentencing phase verdict. We next consider whether, as Edenfield argues in his cross-appeal, such evidence would have had a significant effect in the guilt/innocence phase, particularly whether there is a reasonable probability that the jury would have found Edenfield to be guilty but intellectually disabled. See OCGA § 17-7-131 (c) (3), (j) (providing for a life sentence for any defendant who is convicted but can prove his or her intellectual disability beyond a reasonable doubt in the guilt/innocence phase of his or her death penalty trial); OCGA § 17-7-131 (a) (2) (as amended in 2017 to replace the term "mentally retarded" with the term "intellectual disability" and to renumber subsections but otherwise without making any change to the relevant definition) ("'Intellectual disability' means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period."). In the sentencing

71

phase, the jury would have been acting entirely within its discretion in selecting a verdict based on its general assessment of Edenfield's intellectual functioning. However, in the guilt/innocence phase, the jury would have been required to consider whether Edenfield had proven beyond a reasonable doubt that he was intellectually disabled under the statutory and clinical definitions of that condition. See *Young*, 312 Ga. at 87-100 (25) (plurality opinion). In view of the higher burden applicable here and in light of our summary and discussion of the evidence set forth above, we conclude that there is no reasonable probability that the evidence presented in the habeas court would have led Edenfield's jury to find him guilty but intellectually disabled beyond a reasonable doubt. See *Schofield v. Holsey*, 281 Ga. 809, 813 (II) (642 SE2d 56) (2007), overruled on other grounds by *Lane*, 308 Ga. at 13.

C. *Presenting Other Mitigating Evidence*

Edenfield also argues in his cross-appeal that, after granting sentencing relief based on his claim regarding intellectual disability, the habeas court omitted findings of fact and conclusions of law

72

regarding the following areas of allegedly mitigating evidence: Edenfield's impoverished upbringing; physical abuse that Edenfield suffered; George Edenfield's propensity to violence; difficulties suffered by Edenfield because of his family's move; and evidence related to Edenfield's incest conviction. See OCGA § 9-14-49 (requiring findings of fact and conclusions of law). We agree that a remand is necessary here. The habeas court's summary denial of "every other claim," does not satisfy the requirements of OCGA § 9-14-49. On remand, the habeas court should address solely the five specific issues listed here. See *Humphrey v. Riley*, 291 Ga. 534, 546 (V) (731 SE2d 740) (2012) (remanding for consideration of a claim that the habeas court "explicitly declined to also address").[11]

---

[11] We express no opinion about whether any or all of these points were sufficiently presented to the habeas court to warrant adjudication at all. If they were not, the habeas court may dispose of them accordingly. But, if they are to be adjudicated, they will require findings of fact and conclusions of law specific to each claim. OCGA § 9-14-49. The habeas court is also reminded that, should it find or assume that trial counsel rendered deficient performance in any manner regarding these particular remaining claims, any prejudice from such deficiencies should be weighed collectively with the prejudice stemming from the deficiencies discussed elsewhere in this opinion. See *Lane*, 308 Ga. at 15-16 (1).

## D. *Challenging Custodial Interrogation*

Edenfield also argues in his cross-appeal that his trial counsel rendered ineffective assistance by failing to support his motion to suppress his custodial statements by including evidence of his limited intellectual capacity.  As Edenfield acknowledges, this Court has already addressed the impact of his intellectual deficiencies on the admissibility of his statements, holding as follows on direct appeal:

> Edenfield also contends that the voluntariness of his statements — and his understanding of assurances given to him by investigators — must be considered in the light of his low intellectual capacity.  But our review of the recordings of his statements reveals that he had adequate capacity to understand the context of the assurances and that he did, in fact, understand that context.  Moreover, this conclusion is confirmed by expert testimony at trial, which showed that Edenfield has an intelligence quotient of 83, which puts him in the low end of the average range.  See *Schneckloth v. Bustamonte*, 412 U. S. 218, 226 (II) (A) (93 SC 2041, 36 LE2d 854) (1973) (noting that intelligence of the defendant is among the totality of circumstances to be considered in weighing the voluntariness of his statement).

*Edenfield*, 293 Ga. at 375 (2) n.7.  However, we agree with Edenfield that his motion to suppress would have been enhanced, at least

74

marginally, by a more compelling showing of his limited intellectual capacity.

That said, while it does have a bearing on an assessment of the voluntary nature of a confession, low intellectual functioning is not alone a basis to exclude a statement. See *Barrett v. State*, 289 Ga. 197, 199 (1) (709 SE2d 816) (2011). Instead, as we noted on direct appeal, citing *Bustamonte*, 412 U. S. 226, the intelligence of the defendant is merely one factor comprising the totality of circumstances to be considered in weighing the admissibility of a custodial statement. In light of everything recounted above regarding Edenfield's new evidence of his intellectual deficiencies, in particular our statements regarding that new evidence in relation to his video-recorded confession that we also reviewed and noted on direct appeal, we conclude that such new evidence would not have shown that Edenfield did not voluntarily give his custodial statements. Accordingly, we identify no deficiency on counsel's part regarding the motion to suppress. See *Walker v. State*, 296 Ga. 161, 169 (3) (a) (766 SE2d 28) (2014).

## E. Challenging the State's Forensic Evidence

Edenfield argues that trial counsel rendered ineffective assistance by failing to challenge the State's forensic evidence at trial by calling a forensic pathologist to testify on behalf of the defense. We note that the trial and habeas records show clearly that trial counsel obtained the autopsy report and other forensic reports from the State, spoke "with a physician but not with a forensic pathologist," and concluded about a month before trial that a "[f]orensic pathologist [was] not necessary to explain" the injuries in the case. Nevertheless, our analysis here does not depend on whether counsel made a reasonable investigation into what a forensic pathologist hired by the defense might have been able to say, because we conclude that presentation of testimony at trial like the testimony from a new forensic pathologist that Edenfield has presented in his habeas proceedings would not in reasonable probability have changed the jury's findings as to his guilt or as to

76

his sentencing.[12] See *Hall v. Lee*, 286 Ga. 79, 95 (II) (C) (684 SE2d 868) (2009) (concluding that the expert testimony presented on habeas would not in reasonable probability have changed the outcome if presented at trial).

At the habeas hearing, Edenfield presented affidavit and live testimony from Dr. Jonathan Arden, a forensic pathologist who criticized the trial testimony of the State's forensic pathologist, Dr. James Downs. The Warden called Dr. Downs to testify in response, and then Edenfield recalled Dr. Arden to testify in rebuttal. Below, we address the two witnesses' testimony together as to each topic

---

[12] In contrast to our discussion above requiring remand for findings of fact and conclusions of law, the habeas court addressed this matter at some length in its discussion of the guilt/innocence phase, and that discussion also identified the matter as having potential bearing on the sentencing phase. Thus, when the habeas court later stated summarily at the end of its order that it was denying "every other claim" beyond the one claim on which it granted relief, that denial must be considered in concert with the prior consideration of this issue in relation to the guilt/innocence phase. Coupled with that discussion by the habeas court regarding the guilt/innocence phase and the findings of fact and conclusions of law made there, we conclude that this otherwise-summary disposition by the habeas court regarding this claim as it concerns the sentencing phase was sufficient to satisfy the requirement of OCGA § 9-14-49 for findings of fact and conclusions of law and was sufficient to support our analysis here. Cf. *Riley*, 291 Ga. at 546 (V) (remanding for consideration of a claim that the habeas court "explicitly declined to also address").

raised by Edenfield in his cross-appeal, followed by an analysis of the combined effect that testimony has on our analysis of Edenfield's claim here.

1. *Injuries to the Anal Area*

We begin with a discussion of Dr. Downs's trial testimony regarding his assessment of injuries to the victim's anus and the area near it. Dr. Downs testified that during his autopsy the "body was in a state of decomposition," specifically at the "early end of" that process when "gas forms in the soft tissues so things get swollen," "external skin starts to get separated from the soft tissues underneath," and "the area of the skin that has the pigment tends to slide off." He testified that there were "two separate areas of bruising that [he] saw grossly" during his in-person examination of the body. The first was "a quarter inch area of hemorrhage" that was "at the six o'clock edge of the perineum, which is the space between the anus and the penis." The second was a "one inch bruise" that was "at the edge of the anal margin" and "extended down into the soft tissues." He opined regarding this second injury:

78

Some type of blunt force had to cause that. One type of blunt force would be a penetration, a stretching injury because that area of the body while accommodating a certain stretch at some point you're going to damage it particularly if it's done – penetration is done roughly. So that bruise would be consistent with penetration.

He also testified that he had taken "microscopic sections" and "confirmed in the areas that were injured that there was fresh blood there."

Dr. Arden testified at the habeas hearing that he agreed with Dr. Downs's characterization of the body's stage of decomposition, and he relied on the body's partial decomposition to question Dr. Downs's findings regarding the anal area. First, Dr. Arden testified that he was unable to see, in the photographs he reviewed, any injury to the perineum but that he instead saw "tissues that were decomposed and decomposing." Regarding his microscopic examination of the sample from this area, he testified: "I saw the postmortem decompositional changes, but I did not see any hemorrhage." Regarding the second potential injury, the one to the margin of the anus itself, he testified that he "did not observe any

contusion that matches the description of being one inch and following the 6 to 9 to 12 o'clock margin of the anus." As to his understanding of Dr. Downs's description of this injury, Dr. Arden testified on cross-examination: "But my reading of his words is that it's 1-inch wide and extending along that half of the circumference." As to his own microscopic examination, he testified that he "saw substantial postmortem changes," but he also admitted that he "saw one very small area . . . of some mild hemorrhage." He explained that, given Dr. Downs's "description of anal penetration, especially as Dr. Downs referenced if it's done roughly," he "would expect to see widespread, acute hemorrhage pretty much throughout the tissue" and "would expect to see a laceration of the anus." He opined that the "best explanation here is decompositional change," and he explained that such a mild hemorrhage "could also happen not only from penetration or an assault, that could also happen from, for instance, straining at hard stools." However, he reiterated: "But I do not see any convincing evidence that there was indeed a bruise as described." And he stated regarding what he would have

80

expected to see from an anal rape: "Definitive evidence of hemorrhage and bruising and very likely a laceration as well."

On his direct examination at the habeas hearing, Dr. Downs gave testimony reacting to Dr. Arden's testimony, something that he would have been permitted to do at trial if Dr. Arden had testified there. Dr. Downs reiterated that he had microscopically "confirmed that there was blood underneath" the two areas of "discoloration" that he had observed during his in-person examination of the victim's anal area. He also directly contradicted Dr. Arden's understanding of his description regarding the size of the possible injury to the margin of the anus, stating:

> [M]y description was never intended to say it extended from 6 to 9 to 12. What that's intended to say is I opened the anus up, I sectioned it. I'm not going to pretend to say this is at 10 o'clock now because I've altered the appearance.

Considering these two witnesses' testimony about the possible injuries to the victim's anus, we do not find them to be incompatible, as both left open the possibility that such injuries existed. To the extent Dr. Arden attempted to discredit Dr. Downs's testimony, we

81

agree with the habeas court's assessment that Dr. Arden merely asserted that there was "no conclusive evidence" of anal injury, meaning that his effort to discredit Dr. Downs largely fell flat.

2. *Possible Bite Mark*

We turn next to Dr. Downs's trial testimony about a possible bite mark on the victim's back. Dr. Downs's conclusions about this potential injury were driven in part by testing swabs he took from various parts of the victim's body. He explained that amylase was "an enzyme that's present in lots of different areas in the body at low concentrations" but was a major component of saliva that was "fairly hardy" and "tends to hang around." He explained that the swabs he had taken of some areas of the victim's body had tested negative for amylase, but he continued: "The areas that I tested again [–] the back, the buttocks, the penis [–] those were positive." He then turned directly to the topic of a possible injury to the victim's back. He explained:

> [O]n Christopher's left upper back, there was a crescent shaped mark about two inches, a little less than two inches diameter of bruising. And associated with that

was a positive test for amylase. My opinion that's consistent with a human bite mark.

In his habeas testimony, Dr. Arden explained that one "can find amylase in perspiration, sweat, urine, [and] some other bodily fluids as well," but he also indicated that "it is found in higher concentration in saliva." As to possible bruising injuries in general, he explained: "Yes, postmortem discoloration can, indeed, look like a bruise, or either simulate it or hide it or obscure it or make it unclear." Regarding the possible bite mark in particular, Dr. Arden testified: "In my opinion, the microscopic examination does not support the conclusion that there was a real blunt injury to that part of the body[, because,] if that were a real injury incurred during life, I would expect to see substantial hemorrhage spread over wide areas relative to the size of that tissue sample." Nevertheless, Dr. Arden did not exclude the possibility that the injury identified by Dr. Downs was in fact "real." While Dr. Downs had described his findings as "consistent with a human bite mark," Dr. Arden could only say that it was "not conclusively a bite mark" and that, while

83

the discoloration was "potentially consistent with a human bite mark, that feature by itself [wa]s not specific enough to make a definitive conclusion as to it being a bite mark." Similarly, while Dr. Arden criticized Dr. Downs for not consulting with an odontologist, which is an expert on teeth, he also had not done so.

In his own habeas testimony in response to Dr. Arden's, Dr. Downs explained that he had consulted an odontologist in the past in other cases, but he stated: "But in a case like this, because you have that leaking of pigment – blood pigment in a bruise out into the tissues, you lose the individual teeth. It's not expected to be there. It wasn't there." He also reemphasized that his opinion regarding the existence of a bite mark was based in part on the positive testing "for amylase, saliva." He concluded: "And I stated very clearly [in trial testimony], it is an opinion. I believe it to be consistent with a bite. I still do."

Considering these two witnesses' testimony about the possible injuries to the victim's back resulting from a human bite, we do not view them as being directly contradictory, as Dr. Arden simply found

84

the evidence inconclusive while Dr. Downs found it persuasive. Rather, while Dr. Downs developed an opinion that the evidence supported an injury consistent with a human bite mark, Dr. Arden opined that the evidence did "not conclusively" point to a bite injury.

### 3. *Seminal Fluid*

Dr. Downs also testified briefly at trial about possible seminal fluid that had been found on the garbage bags from which the victim's body had been recovered. He testified, "That was determined chemically but not confirmed by serology." And he continued:

> Well, I'm not a forensic biologist, but what they do are screening tests and confirmation tests. So one test indicated that there was seminal fluid. Semen has two components, two major components again, kind of like saliva that we're interested in. One is the chemical part, the ejaculate. The other is the cellular part, the semen. So you can have ejaculation, seminal fluid without the deposit of sperm cells.

On cross-examination by Edenfield, Dr. Downs confirmed that the presence of semen had not been confirmed, although trial counsel seems to have understood the relevant confirmatory testing at issue

85

to have been DNA testing rather than more-standard serological testing for the presence of sperm.

In his habeas testimony, Dr. Arden gave a comparable explanation of the two components of male ejaculate, a "liquid medium" and "the cellular component, which is the spermatozoa, the actual sperm cells."  As to chemical testing for the presence of the "liquid medium" on the garbage bags, he testified that there was "one bag that was negative," but he admitted that "the other four bags" had "some results listed as weak positive" while also having "results labeled as negative."  He explained that the weak-positive results from the chemical "acid phosphatase" test for seminal fluid, when combined with a negative chemical test for "P30," which is prostate enzyme, and a negative microscopic examination for spermatozoa, "means that there was no semen found."  He continued: "Sure, I suppose there is some possibility.  There is no evidence for it.  There is no reason to make that conclusion, to support a conclusion, but I guess pretty much anything is possible."  Then, on cross-examination by the Warden, Dr. Arden

86

acknowledged again that the lab report that Dr. Downs received for use during his autopsy showed the chemical presence of seminal fluid.

In his own habeas testimony, Dr. Downs on cross-examination explained how the absence of sperm did not change his opinion about the presence of seminal fluid on some of the bags, stating: "That's correct, because there's different things. Sperm cells don't necessarily always accompany ejaculation. Not to get graphic, but I think the lay use is 'pre-cum.'"

Once again, our comparison of the two witnesses' testimony reveals no fundamental inconsistencies, as both affirm that one chemical test indicated the presence of seminal fluid on some of the bags but that no other confirmatory evidence was found, particularly with regard to the presence of spermatozoa. Furthermore, any such testimony, whether conclusive or not, would have been viewed by the jury through the prism of Edenfield's own admission that he masturbated and rubbed his penis against the victim as he was being raped, even marking on a photograph of the victim's body

87

exactly where his penis made contact with the victim.

4. *Injuries to Neck and Asphyxiation*

The final topic of testimony discussed by Edenfield in his claim here concerns the injuries to the victim's neck and the mechanism of death. Dr. Downs testified that he "did not see any significant gross trauma" to the area but that he found "fresh blood" in his microscopic examination of "the area of his windpipe, his voice box." He concluded that "the finding in the neck was consistent but not diagnostic of the cause of death," and he ultimately reached the opinion that "Christopher died as a result of asphyxiation." He testified that his opinion was not affected by the lack of breakage of the "hyoid bone" in the victim's neck, because such bones in children, unlike in adults, are "cartilage so they're soft, bendable, flexible." Furthermore, as he testified, death by asphyxiation can be accomplished with merely five pounds of pressure to the jugular veins in the neck that service the brain, as compared to the ten pounds of pressure required to block the carotid arteries in the neck or the thirty pounds of pressure required to block the windpipe.

Thus, he explained, asphyxiation, which is simply the deprivation of oxygen to the brain by *any* means, could have been accomplished on the child victim by strangulation without causing more injury than he observed on the body, particularly if the strangulation had been accomplished with hands held flatly against the neck without "digging [the] fingernails in."

In his habeas testimony, Dr. Arden likewise testified that he saw no injuries in his gross examination, which he performed only by examining photographs of the victim's body. However, he added that he "would expect to find localized areas of bruising" and "would also be very concerned about finding injuries either to the larynx itself or to the hyoid bone above it." He testified regarding his own microscopic examination:

> I did not see definitive hemorrhage. This is similar to one of the other earlier [microscope] slides that I discussed where I saw a few tiny areas of potential extravasation of red blood cells from the blood vessels. But definitive hemorrhage? No. Widespread hemorrhage? No.

He added regarding the area of the hyoid bone that the "likelihood of having grossly visible hemorrhage is actually quite large" where

89

there is manual strangulation. On cross-examination by the Warden, he admitted: "It is possible to asphyxiate somebody without leaving much bruising under certain circumstances." And he again acknowledged observing "very mild extravasation associated with the larynx," although "not the degree or extent of hemorrhage that [he] would expect if this were indeed a real injury." He summarized: "In my opinion, the evidence is insufficient to diagnose it as a real injury." Nevertheless, Dr. Arden agreed with Dr. Downs that asphyxiation was "the most likely mechanism of death" in some manner, although he did not explain how it might have occurred in the victim's case.

Testifying in response to Dr. Arden's habeas testimony, Dr. Downs explained his opinion regarding the small amount of blood visible in microscopic examination of the neck structures:

> Basically with the eyeball examination, I didn't really see anything, and that makes good sense, because the area here, the chin is down, so basically that area is going to be squeezed and it going to be, like, the livor mortis. It's going to squeeze blood out of the specific area. . . . [Microscopically,] I did see interstitial blood or red blood cells in the soft tissues at the site adjacent to the larynx,

90

which, again, with livor mortis, blood is going to settle with gravity, it's going to go down. This is not a down area.

He reiterated his trial testimony regarding how death by asphyxia can be accomplished with only "five to six pounds of pressure to block the veins," concluding: "It doesn't take much pressure at all. It's certainly not a crushing type injury." He also stood by his prior trial testimony regarding the flexibility of cartilage in a child's neck as compared to solid bone in an adult's neck.

On balance, Dr. Downs's original trial testimony was not significantly undermined by Dr. Arden's habeas testimony, particularly in light of Dr. Arden's concessions on cross-examination that the mechanism of death was asphyxiation and that strangulation could have occurred without significant bruising.

5. *General Analysis of Testimony*

Considering Dr. Downs's and Dr. Arden's two sets of testimony together, it appears to us that their opinions were not directly at odds. Much of what they disagreed upon regarded merely the degree of certainty of particular findings. And, as to that point, Dr. Downs's

habeas testimony in response to Dr. Arden's habeas testimony provided compelling reasons for the habeas court to disregard many of Dr. Arden's criticisms. Much more importantly, however, is the fact that, even assuming the correctness of Dr. Arden's testimony, it would have had little impact on the jury's deliberations. In light of the evidence as a whole, it is implausible that the jury would have doubted that the victim was raped and then murdered by asphyxiation. Dr. Arden's testimony mostly just chipped away at small edges of the State's evidence, leaving the jury, if it had heard Dr. Arden's testimony at trial, with no reason to alter its verdict at either phase of Edenfield's trial. Thus, we conclude that Edenfield has failed to show here that Dr. Arden's testimony would in reasonable probability have contributed to a different outcome at trial. See *Lee*, 286 Ga. at 95 (II) (C) (concluding that the expert testimony presented on habeas would not in reasonable probability have changed the outcome if presented at trial).

*F. Challenging Three Jurors*

Edenfield argues that trial counsel rendered ineffective assistance regarding three jurors. We conclude that he has failed to show deficient performance by counsel regarding any of these jurors.

First, Edenfield argues that trial counsel unreasonably failed to move the trial court to excuse Juror T. F., who answered affirmatively when asked during group voir dire whether she had "ever been exposed to allegations of child molestation or child abuse as a witness or just something that has occurred in family or close relatives or friends." She then stated during her individual voir dire that she had been a "witness and a victim" in the prosecution of "[c]hild molestation on [her] father." When asked if she felt that her experience "would affect [her] if [she] were to sit as a Juror in this case," she responded: "I don't feel it affects me at all. I'm past that part of my life and I'm over it, completely."

We begin with the presumption that counsel's actions were reasonable, and that presumption is only buttressed by notes taken by counsel's jury-selection expert indicating that the juror seemed

to have no strong opinions about the death penalty, had made eye contact during voir dire, and was "past that part of [her] life – over it." See *Strickland*, 466 U. S. at 689 (III) ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ."). In the absence of further evidence suggesting otherwise, we conclude that trial counsel did not render deficient performance regarding this juror. See id.

Second, Edenfield argues that trial counsel rendered ineffective assistance regarding Juror P. B. According to Edenfield, the juror acted improperly by not revealing during voir dire, when asked if he had been "exposed to the crime of murder," that his biological father had been charged with murder. To begin, we find this assertion to be unpersuasive, as the juror's response to the vague question asked of him was not necessarily inaccurate. Furthermore, the juror was later excused during the guilt/innocence phase when he reported that the situation regarding his biological father was causing him to have "intrusive thoughts." Edenfield also

argues that trial counsel rendered ineffective assistance regarding another juror, Juror A. D., to whom Juror P. B. commented about his "intrusive thoughts." According to Juror P. B.'s on-the-record statements to the trial court, although Juror P. B. spoke to Juror A. D. about his "intrusive thoughts," Juror A. D. already knew about Juror P. B.'s background from their being members of the same church, and Juror P. B. had not expressed any opinions about Edenfield's case. Edenfield complains that Juror P. B.'s account of his communications with Juror A. D. was only confirmed by a discussion the trial court supposedly had with Juror A. D. that was off the record and out of the parties' presence. However, while we do not condone the potential irregularity of this procedure,[13] which the record suggests as possibly but not conclusively having occurred,

---

[13] We have held that a defendant has the right to be present whenever the trial court discusses potentially prejudicial trial-related matters with the jury. See *Hanifa v. State*, 269 Ga. 797, 806-807 (6) (505 SE2d 731) (1998), disapproved on other grounds by *Clark v. State*, 315 Ga. 423, 435, 437 n.16 (3) (b) (883 SE2d 317) (2023). See also UAP, Introduction ("The defendant shall be present during all proceedings in the superior court."). Thus the procedure here, if it actually occurred, was irregular either because it failed to follow this rule or because any waiver of the rule by Edenfield was not placed on the record as required by the Uniform Appeal Procedure. See UAP, Introduction ("All proceedings in the superior court shall be recorded and transcribed.").

95

we conclude that it does not show the trial court's assessment to be factually flawed. Under these circumstances, we conclude that Edenfield has failed to show deficient performance by trial counsel regarding either Juror P. B. or Juror A. D.

### G. Challenging Alleged Prosecutorial Misconduct

Edenfield argues that his trial counsel rendered ineffective assistance by failing to object to two arguments by the prosecutor. Edenfield's claim lacks merit as to both.

First, it was not improper for the prosecutor to argue that the jury would hear Edenfield's own confession to being "part of the acts" and "what they were doing," including the crime of aggravated child molestation. In fact, Edenfield stated in his video-recorded confession, as summarized by this Court on direct appeal, "that he helped to hold Christopher down as George penetrated the child with his penis, both orally and anally," and that he "rubbed his own penis against Christopher and that he ejaculated on the child." *Edenfield*, 293 Ga. at 372 (1). See OCGA § 16-6-4 (c) (defining aggravated child molestation as "an offense of child molestation

96

which act physically injures the child or involves an act of sodomy"); OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."). As the prosecutor's argument was based on the evidence presented and therefore was not improper, trial counsel did not perform deficiently by not objecting to it.

Second, Edenfield argues that it was improper for the prosecutor to argue that the death penalty would "deter" Edenfield "from committing another crime like this." In support of his argument, Edenfield points to this Court's holding that "it is improper for the State to argue that a defendant will kill in prison simply because he killed while free." *Henry v. State*, 278 Ga. 617, 619 (1) (604 SE2d 826) (2004). However, even assuming that the argument at issue here is forbidden by the holding of *Henry*, we conclude that there is no reasonable probability that the argument contributed significantly to the death sentence in this case, given the strength of the evidence against Edenfield, including his own admissions, and the heinous nature of the crimes. See *Waldrip v.*

97

*Head*, 279 Ga. 826, 833-834 (III) (620 SE2d 829) (2005) (assuming that an argument by the State was improper but finding no prejudice from counsel's failure to object).

*H. Collective Effect of Trial Counsel's Deficiencies*

As stated at the outset of this section, an ineffective assistance of trial counsel claim will succeed if the collective effect of trial counsel's deficiencies in reasonable probability changed the outcome of the trial. See *Lane*, 308 Ga. at 15-16 (1). We note that Edenfield makes no particular argument regarding how these various claims should be considered together as augmenting one another. Nevertheless, considering the collective effect of the various deficiencies either found or assumed above to have occurred in light of our discussion of each of these various claims individually, we conclude that no such reasonable probability exists as to either Edenfield's convictions or his sentences, including his death sentence for the murder. See id.

## III. *Ineffective Assistance of Appellate Counsel Claim*

Edenfield argues that his appellate counsel rendered ineffective assistance by failing to raise a claim on appeal regarding the funding of his trial defense and the trial court's denial of a continuance. An ineffective assistance of appellate counsel claim is governed generally by the same law set forth above regarding ineffective assistance of trial counsel claims, with a habeas petitioner needing to show both constitutionally deficient performance on the part of appellate counsel and resulting prejudice of constitutional proportion in the form of a reasonable probability of a different outcome. See *Strickland*, 466 U. S. at 687 (III); *Battles v. Chapman*, 269 Ga. 702 (506 SE2d 838) (1998), overruled in part by *Shorter v. Waters*, 275 Ga. 581, 584-585 (571 SE2d 373) (2002).

We agree with Edenfield that the appellate brief initially filed in his direct appeal, whether as the result of confusion about whether this Court might grant an extension of time for filing the brief or some other cause, was patently "anemic" and unworthy of the seriousness of the matter at stake. However, based on the rules

of this Court in effect at the time, a team of six attorneys subsequently filed a thorough brief competently raising seven claims of error. Nevertheless, in an argument spanning two paragraphs and less than two pages, Edenfield argues that this appellate team rendered ineffective assistance in failing to raise the particular claims that the trial court erred by forcing him to go to trial despite inadequate funding during the pretrial period and in denying several motions for a continuance. But Edenfield, even here, has never articulated a complete argument for relief on either of these questions. First, Edenfield suggests that the rushed nature of the appellate briefs ultimately filed "underscores appellate counsel's lack of strategy in not challenging these rulings." But, of course, the test is not whether counsel had time to develop a strategy. Rather, the question is whether the representation falls within the scope of representation a competent attorney could render. See *Strickland*, 466 U. S. at 687-691 (III) (A). Edenfield's argument does not include an explanation of how increased funding would have yielded a different verdict. The fact that other attorneys

100

handling different cases during the same time period were able to secure favorable rulings concerning funding that ultimately contributed to bargained-for guilty pleas does not answer the pertinent question of what would have likely happened in Edenfield's case. Second, in light of the broad discretion trial courts have when considering a motion for continuance, Edenfield's broad assertion that appellate counsel should have used "helpful precedent" to litigate the trial court's denial of multiple continuance motions fails in two respects: Edenfield does not explain a basis for why any of the denied motions would have been reversed under an abuse of discretion standard; and Edenfield provides no argument concerning how one or more granted continuances would have produced a substantial likelihood of a different outcome. Because we conclude that, even as now presented in this habeas appeal, Edenfield has failed to demonstrate that the trial court abused its discretion in managing the timing of his trial in light of the funding difficulties that beset the case through much of its pretrial proceedings, we see no merit to his claim that the appellate team

either rendered deficient performance or caused him to suffer prejudice on appeal. See *Head v. Ferrell*, 274 Ga. 399, 410 (V) (C) (5) (554 SE2d 155) (2001) (holding that appellate counsel do not perform deficiently by failing to argue a meritless claim). See also OCGA § 17-8-22 ("All applications for continuances are addressed to the sound legal discretion of the court. . . ."); *Loyd v. State*, 288 Ga. 481, 487 (3) (705 SE2d 616) (2011) (concluding in a death penalty case that the trial court had not abused its discretion in denying the defendant's motion for a continuance where counsel allegedly "had insufficient time to prepare for trial").

## IV. Freestanding Claim of Intellectual Disability

In addition to claiming, as discussed above, that his trial counsel rendered ineffective assistance at trial regarding his alleged intellectual disability, Edenfield further makes a freestanding claim that he is intellectually disabled and that his execution therefore would be unconstitutional. See *Atkins v. Virginia*, 536 U. S. 304, 316 (III) (122 SCt 2242, 153 LE2d 335) (2002) (overruling prior precedent to hold that the execution of an intellectually disabled

person would be unconstitutional). This claim is procedurally defaulted because Edenfield, in the guilt/innocence phase, did not seek a statutorily authorized verdict indicating intellectual disability, nor did he raise such a claim on direct appeal; however, the claim is nevertheless reviewable on habeas corpus in order "to prevent a possible miscarriage of justice." *Young*, 312 Ga. at 88 (25) (a) (plurality opinion) (citing *Turpin v. Hill*, 269 Ga. 302, 303 (3) (b) (498 SE2d 52) (1998); OCGA § 9-14-48 (d)). See OCGA § 17-7-131 (c) (3), (j) (providing for a life sentence for any defendant who can prove his or her intellectual disability in the guilt/innocence phase of his or her death penalty trial). In this procedural posture, the petitioner must prove intellectual disability beyond a reasonable doubt, which notably is the same standard that the jury would have applied if the issue had been raised at trial. See *Holsey*, 281 Ga. at 817 (III), overruled on other grounds by *Lane*, 308 Ga. at 13.

Having already concluded above, in the context of Edenfield's ineffective assistance of trial counsel claims, that the new evidence adduced by Edenfield in the habeas court regarding his alleged

intellectual disability would not in reasonable probability have led to a verdict of guilty but intellectually disabled under a beyond a reasonable doubt standard, see id. at 813 (II), we now also conclude that that same evidence is plainly insufficient to directly satisfy the beyond a reasonable doubt standard applicable to this freestanding claim of intellectual disability under the miscarriage of justice exception, see *Ferrell*, 274 Ga. at 411-413 (VI). Furthermore, in reaching this conclusion, we also reject Edenfield's claim that the beyond a reasonable doubt standard applicable here is unconstitutional, as this Court has recently rejected a similar argument. See *Young*, 312 Ga. at 87-100 (25) (plurality opinion).

*Judgment reversed in Case No. S23A0260. Judgment affirmed in part, and case remanded with direction in Case No. S23X0261. All the Justices concur.*